**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-2001

NATIONAL FEDERATION OF THE BLIND; KENNETH CAPONE; MELISSA
RICCOBONO; JANICE TOOTHMAN,

Plaintiffs - Appellees,

v.

LINDA H. LAMONE, State Administrator, State Board of
Elections, in her official capacity; DAVID J. MCMANUS, JR.,
Chairman, State Board of Elections, in his official
capacity; BOBBIE S. MACK, Member, State Board of Elections,
in her official capacity; PATRICK J. HOGAN, Member, State
Board of Elections, in his official capacity; MICHAEL R.
COGAN, Member, State Board of Elections, in his official
capacity; KELLY A. HOWELLS, Member, State Board of
Elections, in her official capacity,

Defendants – Appellants,

and

AMERICAN COUNCIL OF THE BLIND OF MARYLAND;
VERIFIEDVOTING.ORG; SAVEOURVOTES.ORG; CINDY LABON; CHARLES
CRAWFORD; JANE SHEEHAN,

Intervenors.

--------------------------

CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER; MARYLAND
DISABILITY LAW CENTER; ADAPT MARYLAND; AMERICAN CIVIL
LIBERTIES UNION; ARC MARYLAND; ARC OF THE UNITED STATES;
ASSOCIATION OF ASSISTIVE TECHNOLOGY ACT PROGRAMS; DISABILITY
LAW CENTER FOR VIRGINIA; DISABILITY RIGHTS ADVOCATES;
DISABILITY RIGHTS BAR ASSOCIATION; DISABILITY RIGHTS
EDUCATION & DEFENSE FUND; DISABILITY RIGHTS NORTH CAROLINA;
FREEDOM CENTER; IMAGE CENTER FOR PEOPLE WITH DISABILITIES;
INDEPENDENCE NOW; JUDGE DAVID L. BAZELON CENTER FOR MENTAL

HEALTH LAW; LEAGUE FOR PEOPLE WITH DISABILITIES; MARYLAND
DEVELOPMENTAL DISABILITIES COUNCIL; MARYLAND DISABILITIES
FORUM; NATIONAL ASSOCIATION OF THE DEAF; NATIONAL DISABILITY
RIGHTS NETWORK; ON OUR OWN OF MARYLAND; PARALYZED VETERANS
OF AMERICA; PEOPLE ON THE GO; PROTECTION AND ADVOCACY FOR
PEOPLE WITH DISABILITIES; SOUTHERN MARYLAND CENTER FOR
INDEPENDENT LIVING; UNITED SPINAL ASSOCIATION; WEST VIRGINIA
ADVOCATES; UNITED STATES OF AMERICA,

Amici Supporting Appellees.

―――――――――――――

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  Richard D. Bennett, District Judge.
(1:14-cv-01631-RDB)

―――――――――――――

Argued:  October 28, 2015          Decided:  February 9, 2016

―――――――――――――

Before GREGORY, DUNCAN, and FLOYD, Circuit Judges.

―――――――――――――

Affirmed by published opinion.  Judge Floyd wrote the opinion,
in which Judge Gregory and Judge Duncan joined.

―――――――――――――

**ARGUED:** Julia Doyle Bernhardt, OFFICE OF THE ATTORNEY GENERAL OF
MARYLAND, Baltimore, Maryland, for Appellants.  Jessica Paulie
Weber, BROWN, GOLDSTEIN & LEVY, LLP, Baltimore, Maryland, for
Appellees.  Thomas Evans Chandler, UNITED STATES DEPARTMENT OF
JUSTICE, Washington, D.C., for Amicus United States of America.
**ON BRIEF:** Brian E. Frosh, Attorney General of Maryland, OFFICE
OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for
Appellants.  Daniel F. Goldstein, BROWN, GOLDSTEIN & LEVY, LLP,
Baltimore, Maryland, for Appellees.  Amy F. Robertson, CIVIL
RIGHTS EDUCATION AND ENFORCEMENT CENTER, Denver, Colorado;
Alyssa R. Fieo, MARYLAND DISABILITY LAW CENTER, Baltimore,
Maryland, for Amici Civil Rights Education and Enforcement
Center, Maryland Disability Law Center, ADAPT Maryland, American
Civil Liberties Union, Arc Maryland, Arc of the United States,
Association of Assistive Technology Act Programs, disAbility Law
Center for Virginia, Disability Rights Advocates, Disability
Rights Bar Association, Disability Rights Education & Defense
Fund, Disability Rights North Carolina, Freedom Center, IMAGE
Center for People with Disabilities, Independence Now, Judge

David L. Bazelon Center for Mental Health Law, League for People with Disabilities, Maryland Developmental Disabilities Council, Maryland Disabilities Forum, National Association of the Deaf, National Disability Rights Network, On Our Own of Maryland, Paralyzed Veterans of America, People on the Go, Protection and Advocacy for People with Disabilities, Southern Maryland Center for Independent Living, United Spinal Association, and West Virginia Advocates.  Vanita Gupta, Principal Deputy Assistant Attorney General, Mark L. Gross, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus United States of America.

FLOYD, Circuit Judge:

Maryland allows any voter to vote via absentee ballot. A voter may obtain a blank hardcopy absentee ballot by mail, fax, or by downloading and printing one from a website. The hardcopy ballot must be marked by hand, signed, and returned via mail or hand-delivery to the voter's local election board.

The National Federation of the Blind and individual disabled Maryland voters sued state election officials under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act. Plaintiffs allege that marking a hardcopy ballot by hand without assistance is impossible for voters with various disabilities, and that they have therefore been denied meaningful access to absentee voting. After a bench trial, the district court found that Maryland's program, as then structured, did not comport with ADA and Rehabilitation Act requirements. The district court further found that plaintiffs' proposed remedy—the use of an "online ballot marking tool" that would enable disabled voters to mark their ballots electronically—was a reasonable modification that did not fundamentally alter Maryland's absentee voting program. Defendant election officials now appeal all these aspects of the district court's decision. For the reasons below, we affirm.

4

I.

A.

Elections in the State of Maryland are overseen by the State Board of Elections ("Board"). Md. Code Ann., Elec. Law §§ 2-101 to 102 (Westlaw current through the 2015 Regular Session of the General Assembly) ("Elec. Law"). The Board is comprised of five members. Elec. Law § 2-101(a). The Board appoints a State Administrator of Elections who is designated as "the chief State election official" and tasked with administering Maryland's election apparatus. Id. § 2-103.

Maryland provides its voters with a number of different means to vote. Maryland has nearly 2,000 polling places at which a voter may cast a ballot on Election Day. The overwhelming majority of these polling places are accessible to physically disabled voters and are staffed with election judges trained in serving voters with disabilities. The polling place voting machines have a number of accessibility features designed to assist disabled voters in casting their ballots. Maryland's voting machines allow voters to magnify the font of the ballot, to alter the color contrast, and to position the interface screen such that voters can sit down while casting their ballots. The voting machines can also be programed for non-visual access by means of an audio ballot; when using the audio features a voter receives a headset and numeric keypad to

5

navigate the ballot choices. Voters who desire assistance in marking their ballots may be assisted by an individual of their choosing or by an election judge (in the presence of an election judge of another political party). The voting machines are not compatible with some common personal accessibility devices such as refreshable Braille displays.

Maryland also allows voters to vote in person for an eight-day period before Election Day at sixty-four early voting polling stations. All of these early voting polling places are physically accessible.

Finally, any Maryland voter may vote by absentee ballot. A voter can obtain a ballot by mail, fax, or electronically by downloading a ballot from a website. A voter who electronically downloads an absentee ballot must print out the ballot in hardcopy, mark their choices by hand, and then sign and return the hardcopy ballot to their local board of elections. An absentee voter may designate an agent to pick up and deliver a ballot. Absentee voters may also have an individual of their choice assist them in hand marking the ballot.

B.

Historically, as noted, an absentee voter who obtained an absentee ballot electronically needed to print out the blank ballot and mark their choices by hand on the printed hardcopy

6

ballot.  For several years, Maryland has been developing a piece of software referred to as an "online ballot marking tool."  The tool can be used by absentee voters who choose to obtain their absentee ballots electronically; the tool enables voters to mark their choices electronically and then print out a completed ballot.[1]  When the ballot is printed, the voter's selections appear on a number of pages followed by a separate signature page.  The voter must still sign the signature page and return the entire hardcopy ballot to the local board of elections.  Only printed and signed ballots received by a local board of elections are counted in determining the result of an election.

Maryland's Board developed the online ballot marking tool over a number of years, including with the participation of plaintiff National Federation of the Blind.  The Board has solicited feedback and implemented a number of usability and accessibility enhancements for disabled voters.  The tool is not compatible with all computer browsers or operating systems, but does function properly with a variety of reasonably up-to-date products.  Importantly    for    individuals    with    certain

---

[1] The tool provides the voter an interface program on the computer they are using.  Voters mark their ballots using the computer program and are then presented with a review screen that allows voters to verify that their selections are accurate. When a voter confirms the selections, the computer transmits the information to the state election board's computer server.  The server generates a marked ballot in the form of a PDF file, which the voter can then print out.

disabilities, the ability to use the tool on their own computers may enable them to use the personal assistive devices that they ordinarily use to interface with the computer, such as a refreshable Braille display, to mark their ballot choices.

## C.

An early, non-accessible version of the online ballot marking tool was available to absentee voters during Maryland's 2012 primary elections. Following the primary elections, a question arose as to whether the tool needed to be officially certified pursuant to Maryland Election Law Section 9-102, which requires certification of any "voting system" prior to use. The Maryland Attorney General provided an opinion that the tool did not meet the statutory definition of a "voting system" and did not require certification. See Certification of Voting Systems Does Not Apply to Absentee-Ballot-Marking Wizard, 97 Op. Md. Att'y Gen. 32 (2012). However, apparently due to lingering concerns over the status of the online ballot marking tool, the Board only made the tool available to certain overseas and military absentee voters for the 2012 general election. Use of the tool in the 2012 primary and general elections was apparently uneventful.

The Maryland General Assembly subsequently clarified the status of the tool. In 2013, the General Assembly passed the

8

"Improving Access to Voting Act," 2013 Md. Laws Ch. 157, which, among other things, explicitly required the Board to certify any online ballot marking tool prior to use by voters. See id. (codified at Elec. Law § 9-308.1). Certification requires a supermajority: at least four of the five members of the Board must vote in favor of certification. See Elec. Law § 2-102(c).

The Board continued to make improvements to the version of the tool that had been used in the 2012 election cycle. In particular, the Board implemented certain changes to make the tool more accessible to voters with disabilities. Additionally, in accordance with the 2013 Improving Access to Voting Act, the Board hired an independent consultant, Unatek Inc. ("Unatek"), to perform security testing on the tool. Unatek produced a report in December 2013 concluding that use of the tool was secure.

In February 2014, the Board met and discussed the online ballot marking tool. The Board reviewed the December 2013 Unatek report and interviewed the report's author. Some Board members continued to express concerns about the security of the tool, and the Board did not hold a certification vote.

The Board subsequently hired a second independent consultant, Mainstay Enterprises, Inc. ("Mainstay"), to audit the Unatek security report. The Mainstay audit concluded that Unatek's security assessment had followed industry best

9

practices.  The Board also received and reviewed public comments and had Board staff obtain information on the use of similar ballot marking tools in other states.

The certification issue was again discussed at the Board's April 2014 meeting.  At the meeting, Mainstay briefed the Board on the results of its audit.  Some Board members continued to express concerns about certification and the Board did not take a certification vote.

### D.

On May 19, 2014, plaintiffs sued Linda Lamone, Maryland's State Administrator of Elections, and the five Board members, all in their official capacities.  At the heart of plaintiffs' suit are claims that Maryland's absentee voting process violates the ADA and the Rehabilitation Act.  Plaintiffs sought both a declaratory judgment to that effect as well as an injunction requiring state election officials to make the online ballot marking tool available for use starting with the 2014 general election.[2]  The district court subsequently scheduled a bench trial to begin on August 13, 2014.  The schedule would provide

---

[2] Plaintiffs also sought a preliminary injunction requiring election officials to make the tool available for the June 24, 2014 primary election.  The district court held a hearing on June 11, 2014, and ultimately denied plaintiffs' request.

defendants with sufficient time to implement the tool before the 2014 general election in the event that plaintiffs prevailed.

While the suit was pending, the Board held a specially-scheduled meeting on July 10, 2014, with one Board member absent. The four Board members in attendance voted 3 to 1 to certify the online ballot marking tool. The vote did not satisfy the statutory supermajority requirement and the tool was not certified.

The district court held a three-day bench trial beginning on August 13, 2014.[3] The district court heard testimony on: the

_____

[3] On August 1, 2014, less than two weeks before trial, several individuals and entities who were similarly situated to plaintiffs here filed a motion to intervene in the case. The putative intervenors asserted similar ADA and Rehabilitation Act claims, along with additional claims against Maryland state officials under 18 U.S.C. § 1983 for various alleged constitutional violations. The putative intervenors argued that their rights had been violated in ways substantially similar to plaintiffs, but sought an almost diametrically opposed remedy—an injunction barring certification of the online ballot marking tool. Very broadly, the putative intervenors appeared to be concerned that the tool plaintiffs sought to require Maryland to use was not sufficiently accessible to disabled voters.

The district court held a conference with all parties and the putative intervenors on August 8, 2014. With the agreement of the parties, the district court held the motion sub curia and permitted the putative intervenors to participate in the trial. In its memorandum opinion in this case, the district court ultimately granted the motion to the extent of the intervenors' participation up to and through trial, and considered the intervenors' evidence and legal arguments in reaching its decision; the district court denied the motion to the extent the intervenors sought to assert independent claims against the defendants. It does not appear that either the parties or the (Continued)

difficulties disabled voters have experienced while voting; the Board's development of the online ballot marking tool and the Board's deliberation over certification; the accessibility of the tool for disabled voters; and the security risks posed by the tool.

The district court found that "the evidence demonstrated specific difficulties that some disabled voters have experienced while voting," J.A. 1043, and that "under the current absentee ballot voting program, individuals with disabilities such as those of the Plaintiffs cannot vote privately and independently." J.A. 1044. The district court credited the results of a University of Baltimore usability study that concluded the tool was "highly accessible for disabled voters," J.A. 1047-48, though the district court acknowledged that two individuals testified that they had difficulty accessing and using the tool during a public demonstration period. J.A. 1048. The district court found the tool "compatible with reasonably up-to-date computer and screen access software," "designed in accordance with the Web Content Accessibility Guidelines," and "compatible with refreshable Braille displays." Id. The district court did find that there were still "challenges to

intervenors have appealed any part of the district court's disposition on this issue, and we see no reason to disturb it.

12

private and independent voting by absentee ballot for disabled voters even when using the tool," including that "disabled voters may need assistance in signing their ballots before submission." Id. "However, the testimony at trial also indicated that, because the signature sheet prints on a separate page, the risk of disclosure of a disabled voter's selections was minimalized and, in any event, was significantly less than that afforded under the current paper absentee ballot system . . . ." J.A. 1048-49.

With respect to the security risks posed by the online ballot marking tool, the district court credited expert testimony that the tool "exhibited software independence, meaning a change to the voting software used for an election cannot cause an undetectable change to the outcome of an election" and that "there were no additional risks that did not exist in other methods already available to Maryland voters." J.A. 1049. The district court found that the tool was "not without some security risks" including that "malware could enable [a] third party to observe a voter's selections" and that "a voter's selections could be captured if a third party infiltrated the Board's server during the time a voter's selections and/or the printable ballot were being transmitted." J.A. 1049-50. Additionally, "[t]here was no evidence at trial that the online ballot marking tool had been tested against

13

intentional attempts to infiltrate or hack into the Board's server or the tool." J.A. 1050.

The district court further found that "it is clear that most voters may mark their absentee ballots without assistance" and that plaintiffs "should be afforded the same opportunity, but the State's current voting program does not allow for it." J.A. 1055. Based on the facts found at trial, the district court concluded that plaintiffs had established that they had been denied meaningful access to absentee voting in Maryland in violation of Title II of the ADA and Section 504 of the Rehabilitation Act. The district court entered a declaratory judgment for plaintiffs to this effect. The district court further concluded that plaintiffs' proposed remedy, access to the online ballot marking tool, was a reasonable modification that did not fundamentally alter Maryland's voting program. Consistent with these conclusions, the district court entered a permanent injunction prohibiting defendants from violating plaintiffs' rights under the ADA and the Rehabilitation Act and requiring defendants to make the online ballot marking tool available to plaintiffs for the 2014 general election. This appeal followed.

## II.

We review judgments resulting from a bench trial under a mixed standard of review: factual findings may be reversed only if clearly erroneous, while conclusions of law are examined de novo. Plasterers' Local Union No. 96 Pension Plan v. Pepper, 663 F.3d 210, 215 (4th Cir. 2011). We review the grant of a permanent injunction for abuse of discretion. Legend Night Club v. Miller, 637 F.3d 291, 297 (4th Cir. 2011).

Defendants' appeal principally focuses on the district court's three core legal conclusions: (1) that plaintiffs have been denied meaningful access to absentee voting in violation of the ADA and the Rehabilitation Act; (2) that the online ballot marking tool constitutes a reasonable remedial modification; and (3) that requiring defendants to allow use of the tool does not fundamentally alter Maryland's voting program. We address each of these issues in turn.

## III.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.

15

§ 12132.[4]  To make out a violation of Title II, plaintiffs must show:   (1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability.  Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005).

Only the third of these elements—whether plaintiffs were denied the benefits of a public service, program, or activity on the basis of their disability—is at issue here.[5]  Much of the

---

[4] Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794.  "Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is 'substantially the same.'"  Seremeth v. Bd. of Cty. Comm'rs Frederick Cty., 673 F.3d 333, 336 n.1 (4th Cir. 2012) (quoting Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1265 n.9 (4th Cir. 1995)).  Because under the circumstances presented in this case plaintiffs' ADA and Rehabilitation Act claims rise and fall together, for simplicity our opinion combines them and principally analyzes the ADA claim.  Cf., e.g., A Helping Hand, LLC v. Baltimore Cty., Md., 515 F.3d 356, 362 (4th Cir. 2008) ("Congress has directed courts to construe the ADA to grant at least as much protection as the Rehabilitation Act and its implementing regulations.").
[5] Title II allows plaintiffs to pursue three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations.  A Helping Hand, LLC, 515 F.3d at (Continued)

16

dispute revolves around the proper way to define the scope of the relevant public service or program at issue. Plaintiffs argue that the appropriate analytic scope is Maryland's absentee voting program. Defendants urge analysis of Maryland's voting program in its entirety, encompassing the various voting alternatives—including in-person voting—available to Maryland voters. Defendants argue that even if absentee voting is not fully accessible, the full accessibility of Maryland's in-person polling places provides disabled voters with meaningful access to voting. As explained below, we conclude that defendants' proposed focus is overbroad and would undermine the purpose of the ADA and its implementing regulations.

A.

Defendants' argument for holistic consideration of Maryland's voting program is in some immediate tension with the

---

362. Defendants somewhat mischaracterize plaintiffs' claims as advancing a disparate impact theory of discrimination. See, e.g., Br. of Appellants 38. While some sort of disparity will necessarily be present in cases of discrimination, that does not mean that all discrimination cases are legally evaluated as "disparate impact" cases; we do not interpret plaintiffs' arguments as advancing a legal disparate impact theory (and the district court did not evaluate them as such). We understand plaintiffs to be pursuing their claims on the theory that defendants have failed to make reasonable accommodations that would afford disabled individuals meaningful access to Maryland's absentee voting program.

17

text of the ADA. Title II states that a disabled individual may not be "excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Defendants' proposed focus on voting in its entirety effectively reads out much of this language, suggesting that Title II prohibits only complete exclusion from participation in broadly-defined public programs. However, Title II is disjunctive. By its own terms it is not limited only to public "programs"; it applies to "services, programs, or activities." Id. (emphasis added). Title II does not only prohibit "exclusion from participation" in a public program; it also separately prohibits "den[ying] the benefits" of that program. Id.[6] And in addition to those prohibitions, Title II separately generally prohibits "discrimination by any [public] entity." Id. Although the bare language of Title II does not definitively resolve the question of appropriate scope, it does

---

[6] The United States, as amicus, suggests that defendants would still be in violation of Title II even were we to conclude that Maryland's entire voting program was "the" program subject to Title II's requirements. We acknowledge that it is possible to view the ability to vote from the comfort of one's home as one of the "benefits" of Maryland's overall voting program, the denial of which benefit on the basis of disability might support a Title II claim. However, given our conclusion below that we must evaluate Maryland's absentee voting program directly, we need not address the United States's contention.

18

suggest to us that some granularity in analytic focus is necessary.

The Supreme Court has cautioned against defining the scope of a public benefit so as to avoid questions of discriminatory effects. In Alexander v. Choate, 469 U.S. 287, 301 (1985), a Rehabilitation Act case, a unanimous Court counseled that in assessing whether a disabled individual had been provided with meaningful access to a benefit, "[t]he benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled." See also id. at n.21 (citing with approval the government's statement that "[a]ntidiscrimination legislation can obviously be emptied of meaning if every discriminatory policy is 'collapsed' into one's definition of what is the relevant benefit"). The logic of Alexander further suggests that we should proceed cautiously to avoid defining a public program so generally that we overlook real difficulties in accessing government services.

Also significant for our analysis of the proper scope of review here is the fact that Maryland allows any voter to vote by absentee ballot. Elec. Law §§ 9-301, 9-304. Absentee ballots are not provided only to a limited set of voters with a demonstrated need to vote absentee; they are instead provided to the entire Maryland electorate at the option of each individual

19

voter. On the whole, then, we think it is far more natural to view absentee voting—rather than the entire voting program—as the appropriate object of scrutiny for compliance with the ADA and the Rehabilitation Act.

Defendants' remaining arguments against this straightforward conclusion are unpersuasive. Defendants cite an ADA-implementing regulation, 28 C.F.R. § 35.150(a), which they assert requires a reviewing court to view Maryland's voting program "in its entirety." However, the cited regulation expressly pertains to "existing facilities." See id. On its face, this regulation simply provides that a public entity does not have to make each of its facilities accessible as long as individuals with disabilities have access to that entity's offered public services. This regulation is targeted principally at physical accessibility and allows a public entity to provide accessibility alternatives that would not require large-scale architectural modifications of existing facilities. Accord Constantine, 411 F.3d at 489 (discussing 28 C.F.R. § 35.150(a) and explaining that "structural changes in existing physical facilities" are "probably the most expensive enterprise" in providing accessibility).

Other ADA-implementing regulations, however, are applicable here and conflict with defendants' proposed focus on the entirety of Maryland's voting program. As one example,

20

28 C.F.R. § 35.130 ("General prohibitions against discrimination") directly implements the general anti-discrimination mandate of Title II. Subsection (b)(7) of the regulation requires public entities to make certain reasonable modifications in "policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability"; this regulation clearly contemplates a focus on accessibility at a more granular level than entire government programs—the level of "policies, practices, and procedures." Id.[7]

Defendants also cite to three district court decisions from other circuits that they argue stand for the proposition that all aspects of a state's voting program must be viewed together when analyzing an ADA claim. Br. of Appellants 55-56. It is

[7] As another example, 28 C.F.R. § 35.160 states that "[a] public entity shall take appropriate steps to ensure that communications with [disabled persons] are as effective as communications with others" and "shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program or activity of a public entity." Id. § (a)(1), (b)(1). The requirement to provide "auxiliary aids and services" again suggests to us that accessibility cannot be adequately assessed at the highest level of program abstraction. The United States argues that this particular regulation alone is a sufficient basis to affirm the decision here. Br. for United States as Amicus Curiae 17-19. We think that the ADA itself and the general anti-discrimination regulation discussed above provide the most direct resolution in this case. We therefore need not consider whether there might be other independent bases that support an ADA or Rehabilitation Act claim on the facts here.

21

not clear to us that the cited cases in fact support defendants' proposition; in any event, we find them unpersuasive. Further, later decisions in some of those districts (and decisions by the courts of appeals sitting above them), flatly reject the very argument defendants advance here. See, e.g., United Spinal Ass'n v. Bd. of Elections in New York, 882 F. Supp. 2d 615, 623-24 (S.D.N.Y. 2012) ("It is abundantly clear that Defendants are obligated to provide a level of access to their voting program beyond the simple assurance that voters with disabilities are able to cast a ballot in some way, shape, or form."); Disabled in Action v. Bd. of Elections in New York, 752 F.3d 189, 198-99 (2d Cir. 2014) ("[T]o assume the benefit is . . . merely the opportunity to vote at some time and in some way [] would render meaningless the mandate that public entities may not afford persons with disabilities services that are not equal to that afforded others." (quotation omitted)).

B.

Having determined that Maryland's absentee voting program is the appropriate subject of our ADA analysis, we must determine whether absentee voting is accessible to disabled individuals as required by statute and implementing regulations. As the Supreme Court has explained:

22

Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals. In studying the need for such legislation, Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."

PGA Tour, Inc. v. Martin, 532 U.S. 661, 674-75 (2001) (quoting 42 U.S.C. § 12101(a)(2)). Congress explicitly found that discrimination was not limited to "outright intentional exclusion," but was also to be found in "the 'failure to make modifications to existing facilities and practices.'" Id. at 675 (quoting 42 U.S.C. § 12101(a)(5)). After thorough investigation and debate, Congress concluded that there was a "compelling need" for a "clear and comprehensive national mandate" to both eliminate discrimination and to integrate disabled individuals into the social mainstream of American life. Id. (internal citations omitted). "In the ADA, Congress provided that broad mandate." Id.

Congress has explicitly directed the Attorney General to promulgate regulations implementing Title II's non-discrimination mandate. 42 U.S.C. § 12134. Pursuant to this directive, the Department of Justice ("DoJ") promulgated a number of regulations, including 28 C.F.R. § 35.130. That regulation provides:

A public entity, in providing any aid, benefit, or service, may not . . . [a]fford a qualified individual

23

with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others . . . [or] [p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result.

28 C.F.R. § 35.130(b)(1)(ii)-(iii).[8] We have recognized that "[t]he department's regulations are the agency's interpretation of the statute, and they are therefore given 'controlling weight' unless they conflict with other departmental regulations or the ADA itself." Seremeth, 673 F.3d at 338 (citing Stinson v. United States, 508 U.S. 36 (1993), and Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 844 (1984)).

We have little trouble concluding from the record before us that Maryland's absentee voting program does not provide disabled individuals an "opportunity to participate . . . equal to that afforded others." See 28 C.F.R. § 35.130(b)(1)(ii). The district court found that "it is clear that most voters may mark their absentee ballots without assistance." J.A. 1055. This finding is not clearly erroneous. The district court further found that Maryland's current absentee voting program does not allow disabled individuals such as plaintiffs to mark their ballots without assistance. Id. This finding is also not clearly erroneous. This sharp disparity makes obvious that

---

[8] The Rehabilitation Act's regulations impose similar requirements. See, e.g., 45 C.F.R. § 84.4(b)(1)(ii)-(iii).

24

defendants have provided "an aid, benefit, or service [to disabled individuals] that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others."  See 28 C.F.R. § 35.130(b)(1)(iii).  The ADA requires more.

Defendants do not seriously challenge the district court's factual findings concerning plaintiffs' current inability to vote without assistance.  Instead, defendants argue that plaintiffs have not been denied meaningful access to absentee voting because disabled individuals such as plaintiffs have no right to vote without assistance.  See Br. of Appellants 59-60.  This argument simply misapprehends the nature of plaintiffs' claims.

This case does not turn on whether there is a standalone right to vote privately and independently without assistance.  Plaintiffs' argument is that defendants have provided such a benefit to non-disabled voters while denying that same benefit to plaintiffs on the basis of their disability.  This is precisely the sort of harm the ADA seeks to prevent.  Cf., e.g., Disabled in Action, 752 F.3d at 199-200 ("Although [plaintiffs] were ultimately able to cast their vote with the fortuitous assistance of others, the purpose of the Rehabilitation Act is 'to empower individuals with disabilities to maximize

25

employment, economic self-sufficiency, independence, and inclusion and integration into society' . . . . The right to vote should not be contingent on the happenstance that others are available to help." (emphasis by 2d Circuit)(quoting 29 U.S.C. § 701(b)(1))); Cal. Council of the Blind v. Cty. of Alameda, 985 F. Supp. 2d 1229, 1239 (N.D. Cal. 2013) ("[R]equiring blind and visually impaired individuals to vote with the assistance of a third party, if they are to vote at all, at best provides these individuals with an inferior voting experience 'not equal to that afforded others.'" (quoting 28 C.F.R. § 35.130(b)(1)(ii))).

Voting is a quintessential public activity. In enacting the ADA, Congress explicitly found that "'individuals with disabilities . . . have been . . . relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals.'" Tennessee v. Lane, 541 U.S. 509, 516 (2004) (quoting 42 U.S.C. § 12101(a)(7)). Ensuring that disabled individuals are afforded an opportunity to participate in voting that is equal to that afforded others, 28 C.F.R. § 35.130, helps ensure that those individuals are never relegated to a position of political powerlessness. We affirm the district court's conclusion that by effectively requiring disabled individuals to rely on the assistance of others to vote absentee, defendants have not

provided plaintiffs with meaningful access to Maryland's absentee voting program.

IV.

Determining that plaintiffs have been denied meaningful access to absentee voting does not end our analysis. Not all public services, programs, or activities can be made meaningfully accessible to all citizens, or at least they cannot be made so without a prohibitive cost or unreasonable effort on the part of the public entity. For this reason, to prevail on their ADA claim, plaintiffs must propose a reasonable modification to the challenged public program that will allow them the meaningful access they seek. See, e.g., Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 464 (4th Cir. 2012) (noting that federal law mandates that federal grantees and public accommodations make "reasonable" modifications to accommodate persons with disabilities).[9]

DoJ regulations implementing the ADA explain that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to

_____

[9] Halpern was a Title III and Rehabilitation Act case. We have noted that in general the different language of Titles II, III, and the Rehabilitation Act should be construed together to the extent possible. Halpern, 669 F.3d at 461-62 (collecting cases).

27

avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).[10] A modification is reasonable if it is "reasonable on its face" or used "ordinarily or in the run of cases" and will not cause "undue hardship." Halpern, 669 F.3d at 464 (citing U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401-02 (2002)); cf. Henrietta D. v. Bloomberg, 331 F.3d 261, 280 (2d. Cir 2003) (stating that the burden of establishing the reasonableness of an accommodation is "'not a heavy one'" and that it "is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits" (quoting Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 138 (2d Cir. 1995))). Determination of the reasonableness of a proposed modification is generally fact-specific. Halpern, 669 F.3d at 464.

The district court here found that plaintiffs' proposed modification—the online ballot marking tool—was both reasonably secure and reasonably accessible to disabled voters. Reviewing the record as a whole, these findings do not appear clearly erroneous and we see no need to disturb them. Further, although not determinative by itself, the fact that a version of the tool

---

[10] The regulations, however, do not require implementation of even reasonable modifications where the "public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). We address defendants' "fundamental alteration" defense below.

28

was voluntarily implemented by defendants in the 2012 elections—"without any apparent incident," J.A. 1057—speaks to the reasonableness of using the tool. Additionally, because the tool has already been developed, there does not appear to be any substantial cost or implementation burden that would need to be borne by Maryland to make the tool available for use. On the facts before us, we conclude that plaintiffs' proposed use of the online ballot marking tool is a reasonable modification to Maryland's absentee voting policies and procedures.

V.

Defendants correctly argue that even a reasonable modification to Maryland's absentee voting program need not be made if that modification would "fundamentally alter" the program. See 28 C.F.R. § 35.130(b)(7); Halpern, 669 F.3d at 464. Defendants bear the burden of proving that the requested modification would be a fundamental alteration to the program. See 28 C.F.R. § 35.130(b)(7). After considering defendants' arguments and reviewing the record as a whole, we conclude that they have not met this burden.

Defendants' principal argument is that certification of voting systems, including certification of the online ballot marking tool under Election Law Section 9-308.1, is fundamental to Maryland's voting program. They argue from this that

29

requiring them to make the online ballot marking tool available for plaintiffs' use, where that tool has not yet received the statutorily-required supermajority vote, works a fundamental alteration to Maryland's voting program. Therefore, defendants argue, the district court abused its discretion in enjoining them to make the tool available to plaintiffs. We disagree.[11]

As an initial matter, the strong form of defendants' argument—that the mere fact of a state statutory requirement insulates public entities from making otherwise reasonable modifications to prevent disability discrimination—cannot be correct. The Constitution's Supremacy Clause establishes that valid federal legislation can pre-empt state laws. Oneok, Inc. v. Learject, Inc., 135 S. Ct. 1591, 1595 (2015) (citing U.S. Const. Art. VI, cl. 2). The Supreme Court has held that the ADA's Title II, at least in certain circumstances, represents a valid exercise of 14th Amendment powers, Lane, 541 U.S. at 533-34, and as such it trumps state regulations that conflict with its requirements. As the Sixth Circuit has put it, "[r]equiring public entities to make changes to rules, policies, practices, or services is exactly what the ADA does." Jones v. City of

---

[11] Given our conclusion that use of the online ballot marking tool does not fundamentally alter Maryland's program, we discern no abuse of discretion in the district court's decision to issue the injunction as the other factors to be considered easily weigh in favor of granting injunctive relief. Cf. Legend Night Club, 637 F.3d at 302-03.

Monroe, MI, 341 F.3d 474, 487 (6th Cir. 2003) (citing Oconomowoc Residential Programs, Inc. v. City of Milwaukee, 300 F.3d 775, 782-83 (7th Cir. 2002)), abrogated on other grounds by Anderson v. City of Blue Ash, 798 F.3d 338 (6th Cir. 2015); accord Mary Jo C. v. New York State and Local Ret. Sys., 707 F.3d 144, 163 (2d Cir. 2013) ("If all state laws were insulated from Title II's reasonable modification requirement solely because they were state laws . . . the ADA would be powerless to work any reasonable modification in any requirement imposed by state law, no matter how trivial the requirement and no matter how minimal the costs of doing so.").

However, we also think that the converse proposition cannot be correct either. Certain requirements of state law could in fact be fundamental to a public program in a way that might resist reasonable modifications otherwise necessary to bring that program into compliance with the ADA. Defendants here urge that Maryland's statutory certification requirement is just such an example: certification, they argue, goes to the very heart of the voting program by ensuring the integrity of the voting process as a whole. Public confidence in elections is undoubtedly an important governmental concern. But on the record before us defendants simply have not established their premise, that is, that use of the online ballot marking tool degrades the integrity of Maryland's voting processes.

31

Put another way, defendants are merging Maryland's procedural certification requirement with substantive concerns about whether the tool should be certified. The mere fact that a procedural requirement has not been met does not necessarily mean that the underlying substantive purpose of that requirement has not been met. The underlying question is fact-specific. See, e.g., Halpern, 669 F.3d at 464-68; cf. Jones, 341 F.3d at 480 ("In cases involving waiver of applicable rules and regulations, the overall focus should be on whether waiver of the rule in the particular case would be so at odds with the purposes behind the rule that it would be a fundamental and unreasonable change." (quotation omitted)). The relevant inquiry here is not whether certification qua certification is fundamental to Maryland's voting program, but whether use of the tool without certification would be so at odds with the purpose of certification that such use would be unreasonable.[12]

Here, the district court found, after a three-day bench trial, that the tool is reasonably secure, safeguards disabled voters' privacy, and (in earlier versions at least) has been

---

[12] The problem with conflating procedure and substance here can be illustrated by analogy to the archetypal physical accessibility modifications often associated with the ADA. It would be difficult for a government entity to resist installation of, for example, wheelchair ramps for a new courthouse, solely by enacting a law requiring that ramps be certified and then declining to certify any ramps.

32

used in actual elections without apparent incident.[13]  We do not think these findings are clearly erroneous and defendants have not provided any substantial reasons that they should be called into question.  Cf., e.g., Pepper, 663 F.3d at 215 ("[I]f the district court's account of the evidence is plausible in light of the record in its entirety, we will not reverse the district court's finding simply because we have become convinced that we would have decided the question of fact differently." (quoting TFWS, Inc. v. Franchot, 572 F.3d 186, 196 (4th Cir. 2009))).  On the record as a whole, we do not conclude that use of the online ballot marking tool is so at odds with the purposes of certification that its use would be unreasonable.  We agree with the district court that defendants have not met their burden to show that plaintiffs' proposed modification—use of the online ballot marking tool—would fundamentally alter Maryland's voting program.

## VI.

We recognize that some of the standard analytic language used in evaluating ADA claims—"failure to make reasonable accommodations"; "denial of meaningful access"—carries with it

---

[13] Nothing in the post-trial record indicates any problems with the use of the tool by plaintiffs in the 2014 general election subsequent to the district court's decision.

33

certain negative connotations. We would be remiss in not highlighting that the record is devoid of any evidence that the defendants acted with discriminatory animus in implementing Maryland's absentee voting program. Indeed, we recognize that Maryland's decision to provide "no excuse" absentee voting to all its citizens provides a benefit that is far from universal across the United States.

However, the ADA and the Rehabilitation Act do more than simply provide a remedy for intentional discrimination. They reflect broad legislative consensus that making the promises of the Constitution a reality for individuals with disabilities may require even well-intentioned public entities to make certain reasonable accommodations. Our conclusions here are not driven by concern that defendants are manipulating the election apparatus intentionally to discriminate against individuals with disabilities; our conclusions simply flow from the basic promise of equality in public services that animates the ADA.

For the foregoing reasons, we affirm.

AFFIRMED

34