*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| STATE OF ALASKA, OFFICE OF THE LIEUTENANT GOVERNOR, DIVISION OF ELECTIONS, | ) ) ) | Supreme Court No. S-18442 |
| | ) | Superior Court No. 3AN-22-06525 CI |
| Appellant, | ) | |
| | ) | O P I N I O N |
| v. | ) | |
| | ) | No. 7636 – December 30, 2022 |
| ROBERT CORBISIER, EXECUTIVE DIRECTOR OF ALASKA COMMISSION ON HUMAN RIGHTS, ex rel. B.L., | ) ) ) ) ) | |
| Appellee. | ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Una S. Gandbhir, Judge.

Appearances: Katherine Demarest, Thomas Flynn, and Margaret Paton Walsh, Assistant Attorneys General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellant. Mara E. Michaletz, Jennifer C. Alexander, and Zoe A. Danner, Birch Horton Bittner & Cherot, Anchorage, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

MAASSEN, Justice.

## I. INTRODUCTION

A special election was scheduled to fill Alaska's vacant seat in the U.S. House of Representatives.  Due to time constraints the election was conducted entirely by mail.  The Division of Elections created an online ballot delivery system to accommodate visually impaired Alaskans, but the system required voters to print out their ballots and return them by mail or fax or at a drop-off location.  An organization advocating for the rights of visually impaired Alaskans sued the Division, seeking a temporary restraining order and preliminary injunction that would prevent the Division from certifying the election results until visually impaired voters were able to participate independently.  The superior court granted the preliminary injunction.  Because we concluded that the superior court erred in its analysis of the tests for granting a preliminary injunction, we vacated the order on June 11, 2022.  This opinion explains our reasoning.

## II.    FACTS

### A.    Background

Don Young was Alaska's sole representative in the U.S. Congress for 49 years.  He died on March 18, 2022,[1] which meant that the State had to conduct a special election to fill the vacant seat.  Under Alaska law a special primary election must occur "not less than 60, nor more than 90, days after the date the vacancy occurs," with the special general election falling "on the first Tuesday that is not a state holiday occurring

---

[1]    Nathaniel Herz, *Alaska U.S. Rep. Don Young Dies at Age 88*, ANCHORAGE DAILY NEWS (updated Mar. 19, 2022), https://www.adn.com/politics/2022/03/18/alaska-us-rep-don-young-has-died-according-to-former-aides/.

not less than 60 days after the special primary election."[2]  Because this short timeline did not give the Division of Elections enough time to prepare for an in-person election, the Division decided to conduct the special primary election entirely by mail.  The special primary election was scheduled for June 11, and the special general election was scheduled for August 16, the day already selected for the regular primary election.

The Division decided to conduct the special by-mail primary election using the familiar absentee voting process it had used in prior elections, the only difference being that voters did not need to request an absentee ballot to receive one.[3]  In addition to completing the absentee ballot they received by mail, voters had the options of voting at an absentee in-person location, voting at an early voting location, or requesting and completing a ballot by online delivery.

To vote absentee by mail, voters had to fill out the ballot, place it in the secrecy sleeve provided, sign the envelope, provide a numerical identifier (Alaska driver's license number, date of birth, partial social security number, or voter identification number), and have a witness over the age of 18 sign the return envelope. To vote absentee in person, voters followed essentially the same process but at one of 160 absentee in-person locations across the state.  Early voting was also available at the Division's five regional offices, the State office building in Juneau, Anchorage City Hall, the Homer City Clerk's Office, the Matanuska-Susitna Borough Building, and Soldotna

---

[2]      AS 15.40.140.

[3]      Alaska is a "no excuse" absentee voting state, meaning that a voter does not have to give a reason for requesting an absentee ballot; anyone may vote using the early and in-person absentee voting options. *Early and Absentee Voting*, ALASKA DIVISION OF ELECTIONS, https://elections.alaska.gov/Core/absenteeearlyandinpersonvoting.php (last visited Nov. 15, 2022).  Because the Division "administer[ed] the special primary election using the same absentee voting process [it uses] for all elections," the Division uses absentee voting terminology when describing the processes at issue in this case.

Prep School. At these locations voters needed to confirm their identity and could vote using either a paper ballot or a voting tablet.

Lastly, voters could request to vote via online ballot. Voters requesting online delivery would receive an email notifying them that they would receive a second email when their ballot was available. Voters would then receive a link to the online ballot delivery website and an access code. After the voter logged in with the access code and the voter's date of birth, the online delivery tool would guide the voter through the voting process and the voter could use a mouse or screen reader to select a candidate. The online delivery tool would then download a ballot package for printing, including the instructions, the voter certificate, the marked ballot, a secrecy sleeve, and a sheet that could be folded to make a postage-paid return envelope. Voters were instructed to return the completed ballot by mail or fax or to drop it off at an absentee in-person or early voting location.

On May 14, 2022, Robert Corbisier, the Executive Director of the Alaska State Commission for Human Rights (ASCHR), and B.L., an Alaska resident and voter who has been blind since birth, attended a meeting that involved Julie Hussman, the Division's Region V Supervisor, to discuss the special election's accessibility for visually impaired voters. Hussman explained that because the special primary election was being held by mail, the Division intended to set up only five accessible voting machines for in-person voting. Hussman presented the Division's view that the online ballot request option provided reasonable accommodation for the visually impaired.

B.L. disagreed, saying that she wanted to work with the Division to find a better solution for ballot accessibility. Another meeting was held on May 27; in attendance were B.L., ASCHR Commissioner William Craig, Corbisier, Division Director Gail Fenumiai, Hussman, the State's ADA Coordinator David Newman, and an assistant attorney general. B.L. and Corbisier explained that in their view the online

ballot had a number of shortcomings that made it not truly accessible: the lack of communication informing visually impaired voters where they could vote in person using accessible machines;[4] the difficulties a visually impaired person would have attempting to navigate printing and returning the online ballot — which involved folding an "origami sleeve" to contain the completed ballot; and the fact that numerous visually impaired individuals in Alaska may not have access to the internet, a computer, or a printer. The assistant attorney general reiterated the Division's position that the online ballot was an adequate and lawful accommodation.

## B. Proceedings

B.L. worked with the Division to improve the audio instructions for the online ballot but, still dissatisfied with the ballot's accessibility, filed a discrimination complaint with ASCHR on June 5. ASCHR, in turn, filed a complaint in superior court two days later, alleging that the Division violated both state and federal law by denying the full benefits of its mail-in election — specifically the ability to vote "secretly, privately, and independently" — to visually impaired Alaskans. ASCHR argued that the election procedures violated the Alaska Human Rights Act,[5] the Americans with

---

[4] As of June 7, the Division website did not inform voters that accessible voting machines would not be available at each of the in-person voting locations.

[5] The Alaska Human Rights Act prohibits the State from refusing or denying "a person any local, state, or federal funds, services, goods, facilities, advantages, or privileges because of physical or mental disability." AS 18.80.255(3).

Disabilities Act,[6] the Rehabilitation Act,[7] and the Help America Vote Act.[8]

---

[6]     The Americans with Disabilities Act prohibits the exclusion of people with disabilities "from participation in or [the denial of] benefits of the services, programs, or activities of a public entity, or [subjection] to discrimination by any such entity." 42 U.S.C. § 12132.

[7]     The Rehabilitation Act prohibits the exclusion of people with disabilities from "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

[8]     The Help America Vote Act (HAVA) requires that "voting system[s] . . . be accessible for individuals with disabilities, including nonvisual accessibility for the blind and visually impaired, in a manner that provides the same opportunity for access and participation (including privacy and independence) as for other voters." For all federal elections, states must ensure that their "voting system [is] equipped for individuals with disabilities at each polling place." 52 U.S.C. § 21081(a)(3)(A)-(B). The Act defines a "voting system" as:

> (1) the total combination of mechanical, electromechanical, or electronic equipment (including the software, firmware, and documentation required to program, control, and support the equipment) that is used—
>
> (A) to define ballots;
>
> (B) to cast and count votes;
>
> (C) to report or display election results; and
>
> (D) to maintain and produce any audit trail information; and
>
> (2) the practices and associated documentation used—
>
> (A) to identify system components and versions of such components;
>
> (B) to test the system during its development and maintenance;
>
> (C) to maintain records of system errors and defects;
>
> (continued...)

It asked for a temporary restraining order and a preliminary injunction, seeking to enjoin the Division from certifying the results of the special primary election until it had "enact[ed] measures sufficient to comply with the accessibility mandates of the Help America Vote Act . . . and ensure[d] that Alaskans who are visually impaired are given a full and fair opportunity to cast their votes independently, secretly, and privately." ASCHR argued that it satisfied the balance of hardships test for obtaining a temporary restraining order and a preliminary injunction because of the irreparable harm that would result if visually impaired voters were "denied the opportunity to meaningfully participate in the Special Primary Election" in violation of the law.

The superior court agreed. It found that ASCHR met both the balance of hardships test and the probable success on the merits test, an alternative basis for granting injunctive relief. Applying the balance of hardships test, the court determined that not being able to vote independently, secretly, and privately was "unquestionably irreparable harm," that the Division's interest in certifying the results of the special primary election was "not a legitimate interest to be protected when doing so controverts federal discrimination law," and that ASCHR had raised "serious and substantial questions" going to the merits of the case. Applying the probable success on the merits test, the court concluded that the test was satisfied because of the Division's admission

---

[8]      (...continued)
> (D) to determine specific system changes to be made to a system after the initial qualification of the system; and

> (E) to make available any materials to the voter (such as notices, instructions, forms, or paper ballots).

52 U.S.C. § 21081(b).

that "the Special Primary Election [was] providing fewer voting methods for visually impaired voters than in the past." The court granted ASCHR's motion for a preliminary injunction and declaratory relief, enjoining the Division "from certifying the results of the 2022 Special Primary Election until Alaska's visually impaired voters [were] provided a full and fair opportunity to participate in said election."

The Division filed an emergency petition for review. We heard it on an expedited schedule and reversed the superior court's order, stating that "[a]n explanation of our reasoning [would] follow at a later date."

## III.   STANDARD OF REVIEW

"Each legally required element of a court's decision on a preliminary injunction is . . . subject to a particular standard or standards of review. A court's legal conclusions about irreparable harm, adequate protection, and the probability of success on the merits of a claim may represent pure questions of law based on undisputed facts or may involve mixed questions of fact and law."[9] "We review a court's conclusions of law de novo" and "[w]e deferentially review a court's factual findings for clear error."[10]

## IV.   DISCUSSION

### A.   The Superior Court's Application Of The Balance Of Hardships Test Erroneously Minimized The Public Interests In Congressional Representation And A Timely Election And Failed To Consider Whether Those Interests Could Be Adequately Protected.

The balance of hardships test for the granting of preliminary injunctive relief requires proof of three elements: "(1) the plaintiff must be faced with irreparable harm; (2) the opposing party must be adequately protected; and (3) the plaintiff must raise 'serious' and substantial questions going to the merits of the case; that is, the issues

---

[9]     *State v. Galvin*, 491 P.3d 325, 332 (Alaska 2021).

[10]     *Id.*

raised cannot be 'frivolous or obviously without merit.' "[11] The test requires the court to balance "the harm the plaintiff will suffer without the injunction against the harm the injunction will impose on the defendant."[12] The test does not apply unless the potential harm to the defendant is "inconsiderable" or the defendant can "be adequately indemnified by a bond."[13]

When the superior court considered the first prong of the balance of hardships test, it concluded that the Division's practices prevented visually impaired Alaskans from voting "independently, secretly and privately" and that this constituted irreparable harm. This finding is supported by B.L.'s affidavit testimony and is not clearly erroneous. The Division did not dispute the test's third prong, that ASCHR raised "serious and substantial questions going to the merits of this case." Accordingly, our discussion focuses on the second prong.

The superior court described its discussion of the test's second prong with the heading "Plaintiff Has Shown that Defendants Will Be Adequately Protected," but its conclusion was actually different: rather than finding that the Division's interests could be protected, it found that the Division's interests were not legitimate enough to be entitled to any weight and thus to any protection. The superior court agreed with the Division's assertion "that this election, and the one to follow, will be thrown into chaos" if certification were delayed, but it also agreed with ASCHR that maintaining the election

---

[11] *Messerli v. Dep't of Nat. Res.*, 768 P.2d 1112, 1122 (Alaska 1989) (quoting *Alaska Pub. Utils. Comm'n v. Greater Anchorage Area Borough*, 534 P.2d 549, 554 (Alaska 1975)), *abrogated on other grounds by Olson v. State, Dep't of Nat. Res.*, 799 P.2d 289 (Alaska 1990).

[12] *Alsworth v. Seybert*, 323 P.3d 47, 54 (Alaska 2014).

[13] *Id.* at 55 (quoting *State v. United Cook Inlet Drift Ass'n*, 815 P.2d 378, 378-79 (Alaska 1991)).

timeline was simply "not a legitimate interest to be protected when doing so controvert[ed] federal discrimination law." The court concluded that visually impaired Alaskans' right to vote in privacy outweighed whatever interest the Division could assert in this context.

The superior court faulted the Division in part for the situation it found itself in, noting that although "this case would have much less impact had Plaintiff brought it sooner[, . . .] the timing of this filing appears to be at least partly due to Plaintiff being unaware of the changes to the previous voting arrangement until very late in the game." But in blaming the Division for its own hardship, the court failed to recognize that the Division's interest in orderly and timely elections is shared with the public generally. At issue was not just the impact an indefinite delay in certification would have on the Division's election administration, but also its impact on the rest of the electorate and on Alaska's broader interest in having representation in Congress. And because the court did not credit these claimed interests, it did not consider the important question of whether the State's interests could be adequately protected during the pendency of an indefinite injunction.[14]

We discussed this issue recently in *State v. Galvin* in the context of the probable success on the merits test (though recognizing that we had also "implicitly considered it under the balance of hardships when evaluating potential public harm from

---

[14]    *Galvin*, 491 P.3d at 333 (" 'Adequate protection' generally means that the party opposing the injunction can be indemnified by a bond when financial harm is at stake; can be otherwise protected by some action; or, at a minimum, is facing only 'relatively slight' harm compared to the potential harm facing the party seeking relief."). Here, the harm to the State's interests could not be indemnified financially, nor could it be characterized as "relatively slight"; the superior court acknowledged that the harm was "more than slight."

a preliminary injunction").[15] We held in *Galvin* that the public interest in "a timely, successful election" was not just the Division's interest as administrator of the process, but was an interest shared by "all citizens of the state," and that it should be considered even when injunctive relief was otherwise justified:

> [The public interest factor] becomes especially important when a requested preliminary injunction threatens the public's interest in an orderly election. As the Ninth Circuit has explained, if a statewide election is at stake, "[t]he public interest is significantly affected," with hardship falling not only on the department running elections, but on all citizens of the state. The Supreme Court has declared, in the context of unconstitutional legislative apportionment schemes, that "where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief." And when considering this relief, "a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws."[16]

In sum, the Division's interests in an orderly and timely election are legitimate, and it shares them with the general public. Critical to the proper application of the balance of hardships test in this case, therefore, was consideration of whether those legitimate interests could be adequately protected during the pendency of an indefinite injunction. Given the court's acknowledgment that enjoining certification of the primary election

---

**15**    *Id.* at 338-39; *see also State v. Kluti Kaah Native Vill. of Copper Center*, 831 P.2d 1270, 1273 (Alaska 1992) (concluding that superior court, when enjoining State's enforcement of particular subsistence hunting restriction under balance of hardships test, failed to adequately consider harm not only to State but also to "other subsistence users . . . whom [the State] represents").

**16**    *Galvin*, 491 P.3d at 338-39 (footnotes omitted) (first quoting *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003); and then quoting *Reynolds v. Sims*, 377 U.S. 533, 585 (1964)).

results would throw both the primary and the general election "into chaos," it was error to conclude that the interests of the Division and the public would be adequately protected. It was therefore error to grant injunctive relief under the balance of hardships test.

**B.    ASCHR Did Not Demonstrate Its Probable Success On The Merits.**

Under the alternative probable success on the merits test for injunctive relief, "the party seeking relief must make a clear showing of probable success on the merits of the dispute before a court may grant the preliminary injunction."[17]   We conclude that this standard, too, was not met as a matter of law.

The superior court explained its ruling on this alternative ground by observing that "the Special Primary Election is providing fewer voting methods for visually impaired voters than in the past." This conclusion is undebatable. But what was provided in the past is not the standard; processes change in response to changed circumstances. As legal authority the superior court also cited the Alaska Human Rights Act,[18] the Americans with Disabilities Act,[19] and the Rehabilitation Act of 1973,[20] all of which generally "protect[] the rights of persons with disabilities and ensur[e] that they are provided with reasonable accommodations." None of these laws define what is a reasonable accommodation in the voting context. But more precisely, the court cited the Help America Vote Act (HAVA), and specifically 52 U.S.C. § 21081(a)(3)(B), as containing "a standard for states to follow by requiring at least one voting system equipped for disabled voters at each polling place."

---

[17]    *Id.* (quoting *Alsworth*, 323 P.3d at 54 n.14) (cleaned up).

[18]    AS 18.80.010-.300.

[19]    42 U.S.C. §§ 12101-12213.

[20]    29 U.S.C. §§ 701-794(g).

HAVA is a lengthy and complex law, and it requires that "voting system[s] . . . be accessible for individuals with disabilities, including nonvisual accessibility for the blind and visually impaired, in a manner that provides the same opportunity for access and participation (including privacy and independence) as for other voters."[21] But while subsection (B) addresses what must be available "at each polling place," it does not impose a requirement that all voting be done via "polling place"; that is, it does not outlaw elections like Alaska's special congressional primary conducted solely via mail-in ballots, nor does it provide standards for mail-in ballot accessibility.

The Division draws our attention to a federal case, *National Federation of the Blind v. Lamone*, that addressed a similar issue in the context of absentee ballots in a Maryland election.[22] Visually impaired voters alleged "that marking a hardcopy ballot by hand without assistance is impossible for voters with various disabilities, and that they have therefore been denied meaningful access to absentee voting."[23] The Fourth Circuit affirmed the district court's finding that the voters' "proposed remedy — the use of an 'online ballot marking tool' that would enable disabled voters to mark their ballots electronically — was a reasonable modification that did not fundamentally alter Maryland's absentee voting program."[24] Alaska has an option that appears to be functionally identical and that would likely satisfy the ADA under the Fourth Circuit's

---

[21] 52 U.S.C. § 21081(a)(3)(A).

[22] 813 F.3d 494 (4th Cir. 2016).

[23] *Id.* at 498.

[24] *Id.* We note that it was the visually impaired voters in *Lamone* who proposed the specific voting method the court accepted as a reasonable accommodation.

analysis.[25]

ASCHR's claim that visually impaired voters were not given sufficient advance notice of the options available to them gives us pause. We are not concluding that ASCHR would have ultimately lost on the merits of its claims after full development of the evidence and the legal arguments. But given the lack of controlling federal law and the Fourth Circuit's guidance in *Lamone*, we must conclude that ASCHR failed to make "a clear showing of probable success on the merits." It was therefore error to base a grant of injunctive relief on this ground.

## C.     The Injunction Was Impermissibly Vague.

We note finally that our decision to vacate the preliminary injunction was also based in part on our conclusion that the order was too vague to satisfy the requirement of Alaska Civil Rule 65(d) that an injunction "be specific in terms." Having found that the upcoming election would not fairly accommodate visually impaired voters, the superior court specifically declined "to impose a solution," noting that to do so was "not the place of the Court, nor the Plaintiff." The court instead "strongly urge[d] the parties to work together expeditiously to find a timely, appropriate remedy." The court enjoined the Division in the meantime "from certifying the results of the 2022 Special Primary Election until Alaska's visually impaired voters are provided a full and fair opportunity to participate in said election."

In *Cook Inlet Fisherman's Fund v. State, Department of Fish & Game*, we affirmed the superior court's refusal to grant an injunction that in effect "simply

---

[25]     ASCHR points out that Maryland is a geographically small state that, at the same time it was litigating the accessibility of absentee ballots, was running an in-person election with 2,000 polling places. By contrast, Alaska provided 160 absentee in-person voting locations and ten early vote locations throughout the state. This is a legitimate distinction. Nonetheless, we conclude that the similarity between the processes is enough to show that ASCHR's ultimate success on the merits is not "clear."

requir[ed] [the Department of Fish & Game] 'to obey the law,' " concluding that such an order "lacks the specificity required to convey what management actions it could take without risking contempt."[26]  Noting that Rule 65 is analogous to the federal rule, we cited the U.S. Supreme Court's opinion in *Schmidt v. Lessard* for the proposition that the rule's "specificity provisions . . . are no mere technical requirements.  The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood."[27]

The superior court in this case ordered the parties to work together to find a remedy that would provide visually impaired voters "a full and fair opportunity to participate in [the upcoming primary] election."  The order acknowledges that the "appropriate  remedy" was unknown at the time; necessarily, therefore, the order fails to inform the State what would constitute "a full and fair opportunity to participate" and thereby satisfy the court's directive.  We understand the superior court's desire to coerce prompt action in response to a genuine problem that may implicate the voting rights of many Alaskans.  But Rule 65(d) contemplates a preliminary injunction that informs the defendant what it must do to comply with it; the injunction in this case did not satisfy that standard.

## V.    CONCLUSION

The superior court's order is REVERSED and VACATED.

---

[26]    357 P.3d 789, 804 (Alaska 2015).

[27]    *Id.* at 804 n.60 (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)).