*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| STATE OF ALASKA, OFFICE OF LIEUTENANT GOVERNOR, DIVISION OF ELECTIONS, and DIRECTOR GAIL FENUMIAI, in an official capacity, | ) ) ) ) ) ) |
| Petitioners and Cross-Respondents, | ) ) ) |
| v. | ) ) ) |
| ALYSE S. GALVIN, | ) ) |
| Respondent and Cross-Petitioner. | ) ) ) ) |

Supreme Court No. S-17887

Superior Court No. 3AN-20-07991CI

O P I N I O N

No. 7540 – July 9, 2021

Petition for Review from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Jennifer Henderson, Judge.

Appearances: Laura F. Fox and Margaret Paton-Walsh, Assistant Attorneys General, Anchorage, and Clyde "Ed" Sniffen, Jr., Acting Attorney General, Juneau, for Petitioners and Cross-Respondents. Kevin R. Feldis and Sarah L. Schirack, Perkins Coie LLP, Anchorage, for Respondent and Cross-Petitioner.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices, and Eastaugh, Senior Justice.[*] [Borghesan, Justice, not participating.]

BOLGER, Chief Justice.
MAASSEN, Justice, with whom CARNEY, Justice, joins, dissenting.

## I.  INTRODUCTION

Alyse Galvin was an Alaska Democratic Party nominee for office but registered as a nonpartisan voter. She sued to stop the Division of Elections from sending out already-printed ballots for the 2020 general election, arguing that the Division's ballot design, by omitting her nonpartisan voter registration, violated both a statutory directive to designate a candidate's party affiliation on the ballot and Galvin's right to free political association under the Alaska Constitution. After the superior court issued a temporary restraining order, the Division petitioned for review. But the following day, the superior court denied Galvin's request for a preliminary injunction; we granted her emergency cross-petition for review and affirmed the superior court's decision in a summary order with this explanation to follow.

We conclude that the Division's evidence supported the superior court's factual finding that granting Galvin's requested injunction would have jeopardized the prospects of a successful and timely election. The superior court did not abuse its discretion by denying Galvin's requested preliminary injunction because granting the injunction could have imperiled the public interest in an orderly and timely election.

---

[*]     Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

## II.   FACTS AND PROCEDURAL HISTORY

### A.   The Division Omitted The Voter Registration Information Of Candidates Such As Galvin On The 2020 General Election Ballot.

At the time of the 2020 general election,[1] Alaska candidates for elected office could appear on ballots in one of two ways:  either nomination by a political party after winning a party primary election[2] or nomination by petition.[3]  Prior to 2018, under Alaska's long-standing "party affiliation rule," a candidate was statutorily required to register to vote as a member of a political party before running in that party's primary election.[4]  Also prior to 2018 the Division of Elections consistently designed general election ballots to list candidates who appeared through party nomination alongside their party and candidates who appeared through petition as non-affiliated.  For instance, the 2016 general election ballot listed United States Representative candidates Jim C. McDermott as "Libertarian" and Bernie Souphanavong as "Non Affiliated."

---

[1]     In November 2020, Alaska voters passed Ballot Measure No. 2, amending or repealing many of the election statutes referred to throughout this opinion, with those changes made effective on February 28, 2021.  2020 Alaska Laws Initiative Meas. 2 (Bal. Meas. 2), 31st Leg., 2d Sess. (2020).  Because Galvin's legal challenge was brought and decided in September 2020, this opinion addresses the statutes in force at that time, rather than at the time of this opinion's publication.

[2]     Former AS 15.25.100 (2020) ("The director shall place the name of the candidate receiving the highest number of votes for an office by a political party on the general election ballot.").

[3]     Former AS 15.25.190 (2020) ("The director shall place the names and the political group affiliation of persons who have been properly nominated by petition on the general election ballot.").

[4]     Former AS 15.25.030(a)(16) (2020).  The statutory provision was enacted in 1980.  *See* ch. 100, § 126, SLA 1980.

In 2018 we held in *State v. Alaska Democratic Party* that the party affiliation rule violated the Alaska Democratic Party's right to free political association under the Alaskan Constitution.[5]  The Party had changed its bylaws to allow candidates not registered as Democratic Party voters to compete as primary candidates, which the rule barred them from doing.[6]  When we held the party affiliation rule unconstitutional as applied, non-party-member candidates were allowed to run for the first time since the rule was enacted in 1980.

In the wake of this decision, the Division designed the November 2018 general election ballot to list candidates' names alongside both their status as party nominees and, for the first time, their voter registration, identified as their "registered affiliation."  Galvin, who won the nomination of the Alaska Democratic Party while registered as a voter of undeclared party affiliation, was listed as "Galvin, Alyse S. (U) [–] Alaska Democratic Party Nominee," while her opponent was listed as "Young, Don (R) [–] Alaska Republican Party Nominee."  The Division used much the same design in its August 2018 primary ballot and August 2020 primary ballot, listing candidates alongside their voter registration status and the name of the party whose nomination they sought.  Galvin, then registered as a nonpartisan voter, was listed on the August 2020 primary ballot as "Galvin, Alyse S. (N) [–] Democratic."

But for the November 2020 general election ballot design, the Division took a different approach.  It omitted voter registration information from the ballot, listing party nominees alongside only the name of the party nominating them.  Galvin had again won the Alaska Democratic Party nomination for U.S. Representative.  The Division's

---

[5]     426 P.3d 901, 904 (Alaska 2018).

[6]     *See id.* at 906.

2020 general election ballot design listed her simply as "Galvin, Alyse S. [–] Democratic Nominee."

The Division finalized this ballot design on June 8, 2020, but gave no public notice of its decision. Over the next few months, the Division programmed the voting equipment based on this new ballot design. On August 31 the primary election results were certified, and on September 5 the Division sent the ballot to the printer.

The clock was counting down to the election to be held November 3, 2020. The Division needed to send out over 11,000 ballots by Friday, September 18, to comply with a federal statutory deadline for sending ballots to overseas voters and military personnel, as well as a state statutory deadline for sending ballots to certain remote voters.[7] Ballots and voting equipment needed to be in place for early in-person voting to start on October 19, 15 days before election day;[8] equipment needed to be sent to remote polling places two to three weeks in advance.

The Division first posted the sample ballot on its website on Thursday, September 10, and Galvin first learned of the design change on Monday, September 14. She challenged the new design in court the next day, by which time the 800,000 ballots needed for the general election had already been printed.

---

[7]     Both statutory deadlines are for 45 days before the election; this 45-day mark technically fell on Saturday, September 19.  52 U.S.C. § 20302(a)(8)(A) (2018); AS 15.20.081(k).  Because the U.S. Postal Service does not process bulk mail on Saturdays, to meet these deadlines the Division needed to mail the advance ballots on Friday, September 18.  The federal statute authorizes a chief state election official to request a deadline waiver for undue hardship, including "a delay in generating ballots due to a legal contest" which renders the state unable to meet the deadline.  52 U.S.C. § 20302(g).

[8]     *See* AS 15.20.064(a) (qualified voters may participate in early voting).

**B.      Candidate Galvin Sought And Was Denied A Preliminary Injunction To Stop The Division From Printing And Mailing Out Ballots Omitting Her Registration As A Nonpartisan Voter.**

Galvin filed her complaint on September 15 against Gail Fenumiai in her official capacity as Director of the Division of Elections.  She sought declaratory as well as injunctive relief.  She asked the superior court to declare the current ballot design statutorily and constitutionally impermissible, enjoin the Division from mailing the challenged ballots, and compel the Division to design and print new ballots displaying candidates' voter affiliations.  Galvin immediately moved for a temporary restraining order and preliminary injunction to prevent the Division from printing its current ballot design.

By the end of that day, the Division's printer had already finished the 800,000 ballots, available in 47 different versions,  needed for the general election.  But Galvin argued that if illegal ballots were mailed out, she would suffer irreparable harm: the election could not be redone, and the injury to her campaign could not be remedied through monetary damages.

Galvin asserted two legal claims.  First, she argued that the Division's new ballot design violated the then-effective statutory provision that a candidate's "party affiliation, if any, shall be designated after the name of the candidate."[9]  Second, Galvin claimed that the Division, by omitting her voter registration affiliation from the ballot, had violated her right of political association under article I, section 5 of the Alaska Constitution.  She described her nonpartisan voter affiliation as an important component of "her identity, her campaign platform, and her relationship with her supporters."

---

[9]      Former AS 15.15.030(5) (2020).

Galvin also argued the ballot design "burden[ed] the associational rights of the non-partisan and independent Alaska voters who support Galvin."

In recognition of the impending election deadlines, the superior court held a hearing the next day to consider a temporary restraining order. On Thursday, September 17, the court granted the order, preserving the status quo by preventing the Division from mailing out ballots until a hearing could be held the following day on Galvin's motion for a preliminary injunction. That afternoon the State filed an emergency petition for our review of the temporary restraining order; Galvin opposed the emergency petition for review. We declined to act until after the next day's superior court hearing, but made time available to hear oral argument on any subsequently filed petition for review.

The State submitted an affidavit by the Division Director as an exhibit to the superior court. In her affidavit, the Director pointed out that 11,000 ballots needed to be sent out by the next day to meet statutory deadlines and that in-person voting was to begin on October 19, only four weeks away. "[B]ased on years of experience running elections," she warned that not enough time remained before the election "to reprint the over 800,000 ballots that have already been printed and re-test the voting equipment."

The Director explained the many logistical steps that would be required to redesign the ballots: rolling back the voting equipment programming to implement the changes to all 47 versions of the ballots; sending the new ballot designs to the printer and approving the resulting proofs; reprinting the 800,000 ballots, which had initially taken ten days to print but might take longer to reprint because the printer did not have enough appropriate paper in stock or staff on hand; reprogramming ballots on touch screen units, which would first need to be retrieved from the regional offices; and retesting the voting equipment to ensure it would accept the new ballots. The Director estimated that testing

the equipment alone takes at least nine days. She concluded, "I do not see how it would be possible to properly carry out the election if we are required to reprint the ballots."

On Friday, September 18, the superior court held a hearing on Galvin's request for a preliminary injunction: specifically, Galvin sought an order that the Division not (1) print any further ballots without her voter registration information or (2) send out any ballots missing that information. The Director testified about the printer's efforts to locate a source of appropriate paper, which might not arrive in Alaska until September 29. Galvin cross-examined the Director but presented no additional evidence of her own. Mindful of the Division's impending deadline to send out ballots by the end of the day, the superior court announced its decision around noon, immediately after the parties finished argument.

The superior court denied the injunction. Based on the Division's evidence, it determined that granting the injunction would harm "the prospects of any sort of organized or successful election moving forward" and that the Division could not be adequately protected from this harm. Therefore, to support granting the injunction Galvin needed to show a clear probability of success on the merits, which the court concluded she had failed to do for either of her claims.

The court was not convinced that Galvin had a viable claim based on freedom of association, as it questioned her constitutional right to express her voter affiliation on the ballot itself rather than through her campaign materials. The court acknowledged the strength of Galvin's statutory argument that the ballots must display a candidate's "party affiliation," meaning voter registration, in addition to "party designation."[10] But, pointing to the Division's argument that historically "party

---

[10]    *See* former AS 15.15.030(5) (2020).

affiliation" and "party designation" had meant the same thing in this context — which party, if any, brought the candidate to the ballot — the court was ultimately not convinced Galvin had demonstrated probable success on the merits of even her statutory claim.

Galvin immediately petitioned for our review of the superior court's denial of the preliminary injunction. Specifically, she requested review of the superior court's rulings that the Division could not be adequately protected against harm if the injunction were granted and that Galvin had not demonstrated probable success on the merits of either her statutory or constitutional claims.

To allow the Division to meet its statutory deadline, we heard oral argument and announced our decision within two hours of receiving Galvin's petition. We granted the petition for review and affirmed the superior court's decision on the record. In early October, we issued a written order to this effect, noting the dissent of two justices and stating that this full explanatory opinion would follow.

## III.    STANDARD OF REVIEW

We have often stated that we review an order granting or denying preliminary injunctive relief for abuse of discretion,[11] but three different standards of review are relevant to this analysis. We review a court's conclusions of law de novo,[12] reversing if we conclude the court misinterpreted, misapplied, or otherwise acted contrary to the law. We deferentially review a court's factual findings for clear error, reversing if, after reviewing the entire record, we are left with a firm and definite

---

[11]     *See, e.g.*, *Lee v. Konrad*, 337 P.3d 510, 517-18 (Alaska 2014); *State, Div. of Elections v. Metcalfe*, 110 P.3d 976, 978 (Alaska 2005).

[12]     *Alsworth v. Seybert*, 323 P.3d 47, 54 (Alaska 2014).

conviction that a mistake was made.[13]   And we deferentially review a court's discretionary rulings for abuse of discretion, reversing if we conclude the court acted unreasonably.[14]

Each legally required element of a court's decision on a preliminary injunction is thus subject to a particular standard or standards of review.[15]  A court's legal conclusions about irreparable harm, adequate protection, and the probability of success on the merits of a claim may represent pure questions of law based on undisputed facts or may involve mixed questions of fact and law.  For example, the court makes a legal conclusion when deciding whether a party faces irreparable harm unless an injunction is granted.  But if the facts underlying that conclusion are in dispute, the court must first make factual findings to establish the nature and extent of the harm.[16]

To obtain a preliminary injunction, the party seeking relief must establish certain predicate elements.  Unless the party establishes these required elements, the superior court has no discretion to grant the requested relief.  But once a party establishes

---

[13]     *Stephan P. v. Cecilia A.*, 464 P.3d 266, 271 (Alaska 2020).

[14]     *See Ranes & Shine, LLC v. MacDonald Miller Alaska, Inc.*, 355 P.3d 503, 508 (Alaska 2015) ("We will find an abuse of discretion when the decision on review is manifestly unreasonable.").

[15]     *See City of Kenai v. Friends of Recreation Ctr., Inc.*, 129 P.3d 452, 455, 455 n.8 (Alaska 2006) ("[Q]uestions underlying the preliminary injunction are reviewed under the appropriate standard of review.  Thus, for example . . . issues of pure law are subject to independent review." (quoting *People ex rel. Gallo v. Acuna*, 929 P.2d 596, 626 (Cal. 1997))).

[16]     The expedited and truncated nature of preliminary hearings often does not lend itself to a full trial-like exposition of evidence.  However, we have not had the occasion to determine evidentiary standards for factual and legal determinations made at this stage.  *See Alsworth*, 323 P.3d at 52 n.9 (declining to determine standard).

the required elements for preliminary injunctive relief, the court exercises its discretionary authority when it ultimately grants some or all requested relief or declines to grant any requested relief; thus, we review that decision for abuse of discretion.[17]

## IV. DISCUSSION

### A. Because The Division Would Not Be Adequately Protected Were Galvin's Requested Injunction Granted, She Needed To Meet The Probable Success On The Merits Standard.

A party may obtain preliminary injunctive relief under one of two standards: the balance of hardships standard or the probable-success-on-the-merits standard.[18] The balance of hardships standard applies when the plaintiff "faces the danger of 'irreparable harm' " if the relief is denied and the opposing party "is adequately protected" from harm if the relief is granted.[19] Irreparable harm is an injury which should not be inflicted and which, "because it is so large or so small, or is of such constant and frequent occurrence, or because no certain pecuniary standard exists for the

---

[17] *See id.* at 54 ("[W]e 'review the issuance of preliminary injunctions for abuse of discretion . . . .' " (quoting *City of Kenai*, 129 P.3d at 455)); 42 AM. JUR. 2D *Injunctions* §14 (2020) (stating that "a plaintiff is generally not entitled to [an injunction] as a matter of right" and even if predicate elements for injunctive relief are demonstrated, "a court must still exercise its discretion to decide whether to grant an injunction"). *But cf. A. J. Indus., Inc. v. Alaska Pub. Serv. Comm'n*, 470 P.2d 537, 541-42 (Alaska 1970), *modified in other respects*, 483 P.2d 198 (Alaska 1971) (without mentioning standard of review, holding petitioner's showing "was sufficient to have required the issuance of a preliminary injunction" under the balance of hardships test).

[18] *Alsworth*, 323 P.3d at 54; *State, Div. of Elections v. Metcalfe*, 110 P.3d 976, 978 (Alaska 2005); *A. J. Indus.*, 470 P.2d at 540.

[19] *Metcalfe*, 110 P.3d at 978 (quoting *State v. Kluti Kaah Native Vill. of Copper Ctr.*, 831 P.2d 1270, 1273 (Alaska 1992)).

measurement of damages, cannot receive reasonable redress in a court of law."[20] "Adequate protection" generally means that the party opposing the injunction can be indemnified by a bond when financial harm is at stake; can be otherwise protected by some action; or, at a minimum, is facing only "relatively slight" harm compared to the potential harm facing the party seeking relief.[21]

Under the balance of hardships standard, the plaintiff need only "raise 'serious' and substantial questions going to the merits of the case; that is, the issues raised cannot be 'frivolous or obviously without merit.' "[22] If the plaintiff does so, the court then "balanc[es] the harm the plaintiff will suffer without the injunction against the harm the injunction will impose on the defendant" to determine whether or not to grant the injunction.[23]

In contrast, if the party requesting preliminary injunctive relief does not face irreparable harm or if the opposing party cannot be adequately protected against injury threatened by the requested relief, then the standard of probable success on the merits applies.[24] Under this standard the party seeking relief must make " 'a clear

---

[20] *Kluti Kaah*, 831 P.2d at 1273 n.5 (quoting *Irreparable Injury*, BLACK'S LAW DICTIONARY (6th ed.1990)).

[21] *See id* at 1273; *State v. United Cook Inlet Drift Ass'n*, 815 P.2d 378, 378-79 (Alaska 1991). This level of harm has also been described as "inconsiderable." *A. J. Indus.*, 470 P.2d at 540 (citing *Ohio Oil Co. v. Conway*, 279 U.S. 813, 815 (1929)).

[22] *Alaska Pub. Utils. Comm'n v. Greater Anchorage Area Borough*, 534 P.2d 549, 554 (Alaska 1975) (quoting *A. J. Indus.*, 470 P.2d at 541).

[23] *Alsworth*, 323 P.3d at 54.

[24] *Id.* at 54-55 (quoting *United Cook Inlet Drift Ass'n*, 815 P.2d at 378-79).

showing of probable success' on the merits" of the dispute before a court may grant the preliminary injunction.[25]

To determine which standard applies here, we ask two questions: (1) whether Galvin faced irreparable harm unless the injunction were granted, and (2) whether the Division could be adequately protected from harm if the injunction were granted. The superior court tentatively stated Galvin was potentially faced with irreparable harm.[26] If Galvin's statutory or constitutional arguments are correct, then she indeed faced irreparable harm; the ballots printed by the Division would be legally inadequate and misleading. The harm to her candidacy cannot be quantified with certainty, and so is not susceptible to monetary compensation.

The superior court found that, based on evidence presented by the Division, granting the requested relief would imperil the prospects of an orderly and successful election. Thus, the court concluded the Division would not be adequately protected if the injunction — preventing the Division from mailing out the ballots missing Galvin's voter registration information, and thus effectively requiring the Division to redesign and reprint ballots containing Galvin's voter registration information — were granted.

The superior court based its conclusion on the affidavit and testimony of Division Director Fenumiai. Galvin cross-examined the Director but presented no contrary factual evidence.

The Director's affidavit and testimony explained the Division's immediate need to mail out ballots to comply with statutory deadlines and the logistical barriers to

---

[25]     *Id.* at 54 n.14 (quoting *A. J. Indus.*, 470 P.2d at 540).

[26]     Neither Galvin nor the Division challenge this finding by the superior court. Whether Galvin faced irreparable harm is nonetheless a required component of our analysis of the court's denial of Galvin's requested injunction.

reprinting the 800,000 ballots required for the general election in a timely manner. The Director emphasized the Division's need to mail some 8,000 ballots to military and overseas voters by the end of September 18 — the day of the preliminary injunction hearing — to comply with federal law. She also noted the Division's need to mail out, on that same day, several thousand other ballots to remote voters in Alaska to comply with state law. The Director reported that the ballot printer had only around 390,000 sheets of appropriate paper in stock and anticipated delays in acquiring enough to reprint all 800,000 ballots.

Galvin suggested that the Division could rely on a hardship exception to justify late compliance with the federal deadline, that the remaining ballots could be replaced expeditiously if the Division put effort into it, and that mere expense or burden is insufficient to show cognizable harm. Indeed, the federal statute authorizes the Director to request a waiver when the State is unable to meet the statutory deadline due to hardship, including "a delay in generating ballots due to a legal contest."[27] But the harm to the Division lay not just in the burden of reprinting the ballots themselves, or even the risk of missing statutory deadlines, but in the danger that the Division might not be able to successfully conduct a timely election. The harm to the Division's interests was therefore also a harm to the interests of Alaskan voters and other political candidates.

The Director's affidavit outlined the follow-on impacts of redesigning the ballots at such a late stage. She described the extensive work the Division had already performed in preparation for the November election, included programming voting machines and testing voting equipment to avoid malfunctions during early voting and on

---

[27]     52 U.S.C. § 20302(g)(2)(B)(ii).

election day. Much of it would need to be redone if the ballots were redesigned. The Director said that, considering the required work and anticipated delays, she did not "see how it would be possible to properly carry out the election if we are required to reprint the ballots." Based on around 20 years of experience at the Division, including over 9 years as Director, she concluded that "there [was] not sufficient time" left before the general election "to reprint the over 800,000 ballots that have already been printed and re-test the voting equipment."

Based on the limited evidence presented in this expedited proceeding, the court's factual finding that granting Galvin's requested injunction would jeopardize a successful election was not clearly erroneous. Given this finding, the court was correct to conclude that were the injunction granted, the Division's interests could not be adequately protected. Thus, for the court to grant the requested injunction, Galvin needed to meet the heightened standard of clear probable success on the merits.[28]

## B. Galvin Did Not Show A Clear Probability Of Success On Her Constitutional Claim.

Article I, section 5 of the Alaska Constitution "guarantees the rights of people, *and political parties*, to associate together to achieve their political goals."[29]

---

[28] We emphasize that under this standard a court should still "avoid [extensive] involvement in the merits of the issues between the parties," as a preliminary injunction decision is usually "based on an incomplete . . . record." *A. J. Indus.*, 470 P.2d at 540. Moreover, an early ruling on the merits "would ultimately result in forcing the court to rule on the merits of the case twice," potentially leading to inconsistent results. *Id.* The goal of a preliminary injunction is merely to ensure a fair playing field for full litigation of the case's merits later. We therefore do not rule on the merits of Galvin's claims.

[29] *State v. Alaska Democratic Party*, 426 P.3d 901, 906 (Alaska 2018)
(continued...)

-15- 7540

Galvin argues that the Division, by designing the ballot to omit her nonpartisan voter affiliation while designating her as Democratic Nominee, violated her rights to free association under the Alaska Constitution. Specifically, she asserted in the superior court that the Division's ballot design impermissibly burdened her "rights to associate with" as well as "the interrelated right *not* to associate with[ ] certain political parties as a voter and an individual."

Galvin contended that she has a constitutional right to political association with voters who might not normally vote for a Democratic Party candidate, but who might vote for her because of her status as a non-Party member. But Galvin has not identified how the Division prevented her from associating with those voters. That the Division did not advertise Galvin's nonpartisan voter affiliation on the ballot itself does not prevent Galvin from publicizing or expressing that affiliation elsewhere. The general election ballot is far from Galvin's only means of expressing her identity as a nonpartisan voter, relating to fellow nonpartisan voters, or appealing for nonpartisan voter support in the election. It is thus not clear that the Division has at all burdened Galvin's constitutional right of political association, and any such burden would be minimal.[30]

We have considered election laws imposing minimal burdens on the right to free association to be constitutional if they are "reasonable, non-discriminatory, and

---

[29]     (...continued)
(emphasis in original); *see* Alaska Const. art. I, § 5.

[30]     *See Rubin v. City of Santa Monica*, 308 F.3d 1008, 1011, 1016 (9th Cir. 2002) (holding city's refusal to allow candidate "to designate his occupation as 'peace activist' on the city election ballot" only minimally burdened his right to free speech, as candidate had ample alternative channels "for communicating his peace activities to the public").

advance[ ] 'important regulatory interests.' "[31] The Division's ballot design decision applies uniformly across candidates; the Division has not omitted Galvin's voter registration information while listing that information for others on the ballot. Whether omitting voter registration information from ballots advances "important regulatory interests" may be subject to debate.[32] But Galvin has thus far failed to show a probability of success, let alone a clear one, on her claim that the Division violated her positive right of political association under the Alaska Constitution.

Galvin also asserts the Division's ballot design violated her right to be free from compelled political association. She cites federal case law for the maxim that the right to free association entails a right against government-mandated association.[33] And she points to our conclusion in *State v. Green Party of Alaska* that requiring "[v]oters . . . to fully affiliate themselves with a single political party" in order to have any

---

[31]    *Alaska Democratic Party*, 426 P.3d at 909 (quoting *O'Callaghan v. State*, 914 P.2d 1250, 1254 (Alaska 1996)).

[32]    The Division asserts various interests including its "desire to create a simple and manageable general election ballot that fits on the page and includes no more information than necessary." *See Sonneman v. State*, 969 P.2d 632, 640 (Alaska 1998) (holding a minimal burden on the right to vote justified by the State's interests in avoiding voter confusion and minimizing costs); *see also Rubin*, 308 F.3d at 1017-19 (concluding minimal burden of omitting candidate's occupation on ballot justified by important state interest in avoiding voter confusion, because occupation of "peace activist" was misleading).

[33]    *See, e.g.*, *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 310 (2012) ("[M]andatory associations are permissible only when they serve a 'compelling state interes[t] . . . that cannot be achieved through means significantly less restrictive of associational freedoms.' " (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984))).

"opportunity to participate in that political party's primary . . . place[d] a substantial restriction on the political party's associational rights."[34]

But no such right against compelled association appears to be at stake here. Galvin freely chose to seek the Alaska Democratic Party nomination for U.S. Representative by competing in that party's primary. If the Division had listed Galvin as a member of the Alaska Democratic Party or identified her as a "Democrat," Galvin's claim might well have some merit; those are forms of party association she has avoided. But the Division neither required her to join that party nor listed her on the ballot as having done so. By listing Galvin on the ballot as "Democratic Nominee," the Division accurately reported an association that Galvin freely sought out and accepted.

Galvin additionally argues that the Division's ballot design burdened the associational rights of nonpartisan or independent Alaska voters who support her. But Galvin does not explain how the ballot design, by omitting her nonpartisan voter registration status, has either prevented any voters from associating with her or compelled them to associate with the Alaska Democratic Party. Galvin cites our previous reasoning, in *Green Party of Alaska*, that requiring voters to either register and thus "fully affiliate themselves with a single political party or forgo completely the opportunity to participate in that political party's primary" restricted certain political parties' associational rights.[35] But registering as a party member requires full affiliation with the party in a way that merely voting for a party nominee — identified as such on the ballot — does not.

---

[34]    118 P.3d 1054, 1065 (Alaska 2005).

[35]    *Id*.

-18-                                                                        7540

Therefore, at the preliminary injunction stage, Galvin does not show a clear probability of success on the merits of any of her constitutional arguments.

C. **Galvin Made A Strong Showing On Her Statutory Claim**.

The language of former AS 15.15.030(5) provides: "The names of the candidates and their *party designations* shall be placed in separate sections on the state general election ballot under the office designation to which they were nominated. *The party affiliation, if any*, shall be designated after the name of the candidate." (Emphases added.)

The Division claims that "party affiliation" and "party designation" are merely two different ways of referring to the same thing, which the Division interprets as "the way in which a candidate reached the general election ballot." Galvin asserts that "party affiliation" means a candidate's voter registration status, while "party designation" refers to a candidate's nominating party. She thus argues that the statute requires listing her nonpartisan voter registration alongside her nominating party on the ballot.[36] The superior court, assessing the parties' competing interpretations as both "viable," concluded that even though Galvin had demonstrated "serious and substantial questions" going to the merits of her statutory claim, she had not demonstrated "probable success on the merits." Galvin challenges this conclusion.

When interpreting a statute, "our goal is to give effect to the intent of the law-making body 'with due regard for the meaning that the language in the provision conveys to others.' "[37] We interpret a statute "according to reason, practicality, and

---

[36]    *See* former AS 15.15.030(5) (2020).

[37]    *Marlow v. Municipality of Anchorage*, 889 P.2d 599, 602 (Alaska 1995) (quoting *Foreman v. Anchorage Equal Rights Comm'n*, 779 P.2d 1199, 1201 (Alaska (continued...)

common sense, considering the meaning of the statute's language, its legislative history, and its purpose."[38] We apply a "sliding scale approach," under which "the plainer the language of the statute, the more convincing contrary legislative history must be."[39]

Galvin argues that since AS 15.15.030(5) refers to both a "party designation" and a "party affiliation," the terms must carry two distinct meanings. It is unclear why the legislature would use different terms in the same statutory provision to mean the same thing.[40] As a primary goal of statutory language is clarity, the use of "elegant variance" — varying the use of synonyms or descriptive terms to avoid boring repetition — is ill-suited to statutory drafting.[41]

Further, Galvin points to several election statutes which seem to equate "party affiliation" with voter registration.[42] For example, AS 15.07.050(b) refers to a

---

[37]    (...continued)
1989)).

[38]    *Attorneys Liab. Prot. Soc'y, Inc. v. Ingaldson Fitzgerald, P.C.*, 370 P.3d 1101, 1105 (Alaska 2016) (quoting *Municipality of Anchorage v. Stenseth*, 361 P.3d 898, 904 (Alaska 2015)).

[39]    *Smith v. Ingersoll-Rand Co.*, 14 P.3d 990, 992 (Alaska 2000) (quoting *Marlow*, 889 P.2d at 602).

[40]    *See Alaska Spine Ctr., LLC v. Mat-Su Valley Med. Ctr., LLC*, 440 P.3d 176, 182 (Alaska 2019) ("Principles of statutory construction mandate that we assume the legislature meant to differentiate between two concepts when it used two different terms.").

[41]    *See* BRYAN A. GARNER, GARNER'S MODERN AMERICAN USAGE 509 (3d ed. 2009) (while discussing "[i]nelegant [v]ariation," noting "maxim in interpreting legal language that if different words are used, different meanings must have been intended").

[42]    AS 15.07.070(k)(1)(C) (requiring director to notify voter registration
(continued...)

"voter's choice of party affiliation on the voter registration application form." And we ourselves have used "party affiliation" to refer to voter registration selections on multiple occasions.[43] For instance, in *Alaska Democratic Party* we repeatedly labeled as "the party affiliation rule" the statutory provision that a candidate must be "registered to vote as a member of the political party whose nomination is being sought."[44]

The Division's primary rebuttal is that former AS 15.15.030(5) could not possibly require a ballot to display both nominating party and voter registration, because the legislators who adopted the statutory language could not have imagined that those two things could be different. The language in former AS 15.15.030(5) providing that "party affiliation, if any, may be designated after the name of the candidate" was adopted

---

**42** (...continued)
applicant of how to "adopt a political party affiliation"); AS 15.07.075 (designating as "undeclared" voters who "fail[ ] to declare an affiliation with a political group or political party on a voter registration form"); former AS 15.25.010 (2020) (providing that "voter[s] registered as affiliated with a political party" may participate in that party's primary); former AS 15.25.060(b) (2020) ("For the purpose of determining which primary election ballot a voter may use, a voter's party affiliation is considered to be the affiliation registered with the director as of the 30th day before the primary election.").

**43** *O'Callaghan v. State, Dir. of Elections*, 6 P.3d 728, 731 (Alaska 2000) (observing that "party affiliation has traditionally been a matter of public record" with a reference to the required compiled list of registered voters by party registration); *cf. O'Callaghan v. State*, 914 P.2d 1250, 1255 (Alaska 1996) (during the operation of the party affiliation rule, using party affiliation to refer to both voter registration and the party name under which the voter seeks nomination); *O'Callaghan v. Coghill*, 888 P.2d 1302, 1302 (Alaska 1995), *supplemented sub nom. O'Callaghan v. State*, 914 P.2d 1250 ("All [blanket] primary candidates are listed on a single ballot without regard to party affiliation. All eligible voters may participate without regard to party affiliation.").

**44** *State v. Alaska Democratic Party*, 426 P.3d 901, 905 (Alaska 2018) (quoting former AS 15.25.030(a)(16) (2020).

in 1962.[45]  This language thus originated decades before our 2018 decision invalidating the "party affiliation rule" enabled candidates to seek a political party's nomination without registering to vote as a member of that party.[46]  But the party affiliation rule, which made it legally impossible for a candidate's voter nominating party and voter registration to differ from each other, was itself not enacted until 1980.[47]

The Division similarly points to decades of apparently unchallenged state practice preceding 2018, during which ballots listed candidates nominated by parties next to the name of that party, as evidence that "party designation" and "party affiliation" are synonymous within the meaning of the statute.  But because the Division's evidence of this practice dates from when the "party affiliation" rule was in effect and forced the party of nomination to match the party of voter registration, it is not particularly relevant.

The Division also argues that even if "party affiliation" means the party selected by a voter during the registration process, Galvin's choice to register as a nonpartisan voter indicates that she has *no* "party affiliation."  Alaska Statute 15.07.075(1) functionally defines "nonpartisan" in the context of voter registration as "without a preference for a political party."  Under this theory, former

---

[45]  Ch. 125, §§ 5-7, SLA 1962.

[46]  *See Alaska Democratic Party*, 426 P.3d at 904-05 ("[B]ased on the unique facts of this case, . . . we affirm the superior court's decision to enjoin the party affiliation rule as unconstitutional.").

[47]  Ch. 100, § 126, SLA 1980.  The Division points out that the law in effect before the party affiliation rule was enacted did require a candidate's declaration of party candidacy to "state in substance . . . that the candidate if nominated and elected will support the principles of the party he seeks to represent." Ch. 83, § 5.03, SLA 1960.  But unlike the party affiliation rule, this requirement did not legally foreclose the possibility of a party nominee not registered as a party member.  *See* former AS 15.25.030(a)(16) (2020) (party affiliation rule).

AS 15.15.030(5)'s directive that "[t]he party affiliation, if any, shall be designated after the name of the candidate" would not require the Division to place any "party affiliation" designation after Galvin's name, since she has none. Galvin counters by pointing to the Division's online voter registration process, which lets voters select "nonpartisan" or "undeclared" as forms of "[p]olitical [a]ffiliation." Further, the Division's 2018 general election ballot listed "Non-partisan" as a form of "registered affiliation." These design decisions suggest the Division may have, until recently, interpreted "party affiliation" to include "nonpartisan."

The Division additionally points to our statement in *Alaska Democratic Party* that on "the general election ballot, the State could simply print the nominating party's name next to the candidate's name."[48] The Division argues we thus concluded that notwithstanding former AS 15.15.030(5), the general election ballot need not include voter registration information. But the Division takes our statement out of context, presumably assuming that by using the word "simply," we meant solely or merely, rather than clearly or without ambiguity. Our statement was not a definitive holding on what former AS 15.15.030(5) meant; rather, our statement merely recognized that pairing a nominating party name with the party nominee's name would not constitute a "deceptive bait-and-switch" as alleged by the State.[49] Furthermore, our other responses to the State's voter confusion concerns in *Alaska Democratic Party* imply an assumption that

---

[48]  426 P.3d at 913.

[49]  *Id.* Specifically, our statement responded to the State's expressed concern about voter confusion: that unaffiliated candidates winning party nomination would necessitate a general ballot that would "either present independent candidates without indicating that a party nominated them, a deceptive bait-and-switch, or present candidates as both independent and political party nominees." *Id.*

"the possible descriptors for [such] a candidate's party affiliation — such as 'nonpartisan,' 'undeclared,' 'non-affiliated,' or 'independent' —" would also be featured on the ballot.[50]

The superior court did not purport to make a final decision interpreting former AS 15.15.030(5), and we do not now decide whether we agree with Galvin's or the Division's interpretation. We need not even decide whether Galvin demonstrated a clear probability of success on the merits of her statutory claim or whether the superior court erred in concluding otherwise. This is because, as detailed below, we ultimately affirm the superior court's decision not to grant the requested preliminary injunction on a separate ground: the hazard that granting the injunction would pose to the public interest in a timely, successful election.

D.     **Regardless Of The Merits Of Galvin's Claims, The Superior Court Did Not Abuse Its Discretion By Denying The Injunction Because Granting It Would Have Imperiled The Public Interest.**

Federal courts are required to consider the public interest when deciding whether to grant a preliminary injunction, considered "an extraordinary remedy never awarded as of right."[51] The United States Supreme Court directs courts, when

---

[50]     *Id.* For instance, we pointed out that "if the State remains convinced that the ballot design itself will be confusing," it could include disclaimers on the ballot "explaining that a candidate's party affiliation denotes only the candidate's voter registration and nothing more." *Id.*

[51]     *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982) ("[W]here an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." (quoting *Yakus v. United States*, 321 (continued...)

"exercising their sound discretion" whether to grant an injunction, to "pay particular regard for the public consequences."[52]

This factor becomes especially important when a requested preliminary injunction threatens the public's interest in an orderly election.[53] As the Ninth Circuit has explained, if a statewide election is at stake, "[t]he public interest is significantly affected," with hardship falling not only on the department running elections, but on all citizens of the state.[54] The Supreme Court has declared, in the context of unconstitutional legislative apportionment schemes, that "where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief."[55] And when considering this relief, "a court is entitled to and should consider the proximity of a

---

[51]    (...continued)
U.S. 414, 440 (1944) (footnote omitted))); *see also* 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.4 (3d ed. 2020 Update) (noting "preliminary relief will be denied if the court finds that the public interest would be injured were an injunction to be issued").

[52]    *Winter*, 555 U.S. at 24 (quoting *Weinberger*, 456 U.S. at 312).

[53]    *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944-45 (2018) (per curiam) ("[A] due regard for the public interest in orderly elections supported the District Court's discretionary decision to deny a preliminary injunction . . . .").

[54]    *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) ("[O]ur law recognizes that election cases are different from ordinary injunction cases. Interference with impending elections is extraordinary . . . ." (citation omitted)).

[55]    *Reynolds v. Sims*, 377 U.S. 533, 585 (1964).

forthcoming election and the mechanics and complexities of state election laws."[56]

We have never expressly adopted the public interest factor into our analysis of preliminary injunctive relief, but we have implicitly considered it under the balance of hardships test when evaluating potential public harm from a preliminary injunction.[57] We clarify now that even if a party requesting preliminary injunctive relief satisfies the requirements of the probable success on the merits standard, a court has the discretion to deny the requested relief if granting it would imperil the public interest.

Here the superior court found that granting Galvin's requested preliminary injunction would threaten "the prospects of an organized and successful election moving forward." We review factual findings like this one only for clear error instead of using our independent judgment to assess their accuracy,[58] and we cannot consider new evidence about what occurred six days after the court rulings in question.[59] The superior court made this factual finding on a limited record in an extremely expedited proceeding. Evidence presented at the preliminary hearing stage — namely, the Director's affidavit

---

[56]    *Id.*

[57]    *See, e.g.*, *State v. Kluti Kaah Native Vill. of Copper Ctr.*, 831 P.2d 1270, 1273-74 (Alaska 1992) (considering preliminary injunction's impact on various other potentially interested groups); *Alaska Pub. Utils. Comm'n v. Greater Anchorage Area Borough*, 534 P.2d 549, 555-56 (Alaska 1975) (considering whether large segment of consuming public could be protected in public utility rate-setting context).

[58]    *Stephan P. v. Cecilia A.*, 464 P.3d 266, 271 (Alaska 2020).

[59]    *See* Alaska R. App. P. 210(a) ("Material never presented to the trial court may not be added to the record on appeal."). The dissent references actions taken by the Division that we cannot consider, as they occurred six days after the superior court denied Galvin's requested preliminary injunction, as well as six days after we declined to reverse the superior court's denial. *See* Dissent at 34 n.18.

explaining the steep logistical barriers to and potentially dire consequences of redesigning ballots so close to the election — supports this finding and renders it not clearly erroneous.

Accepting the superior court's factual finding of a significant threat to a timely, successful election compels the legal conclusion that granting preliminary injunctive relief as requested by Galvin would imperil the public interest.[60] Therefore, even if Galvin had demonstrated a clear probability of success on the merits, the superior court did not abuse its discretion by declining to grant a preliminary injunction that threatened to upend the orderly operation of the November 2020 election.[61]

## V.    CONCLUSION

We GRANT Galvin's petition for review and AFFIRM the superior court's

---

[60]    We do not recommend ignoring a ballot design error's impact on the fairness of the election when weighing an injunction's effect on the public interest. But the ballot design at issue here — which correctly identifies Galvin's name and nominating party — poses a much lower risk of an unfair election than the hypothetical ballot designs posed by the dissent — which leave off Galvin's name entirely or inaccurately report her nominating party. *See* Dissent at 35-36.

[61]    Galvin argues that any electoral crisis resulting from an injunction would be of the Division's own making; despite deciding on the ballot design in June, the Division waited until mid-September, a week before the statutory mailing deadlines, to inform the public of this decision. During oral argument, the Division conceded that in hindsight, it might have been better to disclose its ballot design decision earlier. But the Division also asserted it currently has no regulatory or statutory legal obligation to do so.

The purpose of preliminary injunctive relief is preventative — to prevent irreparable harm pending a full decision on the merits of a dispute — rather than punitive. *See Martin v. Coastal Vills. Region Fund*, 156 P.3d 1121, 1126 (Alaska 2007) ("The purpose of a preliminary injunction is to maintain the status quo.").

denial of Galvin's requested preliminary injunction.  We DENY the State's petition for review of the temporary restraining order as moot.[62]

---

[62]     *See Peter A. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 146 P.3d 991, 994 (Alaska 2006) ("A claim is moot if it has lost its character as a present, live controversy.").

MAASSEN, Justice, with whom CARNEY, Justice, joins, dissenting.

I dissent; I would hold that the superior court should have issued the requested injunction. While I do not object to the court's decision to add a public interest element to our probable-success-on-the-merits test, I do not agree that the public interest in this case should block Galvin's meritorious claim to relief. I would hold that Galvin would likely succeed on her statutory claim; that the public interest when properly defined includes not just the interest in an orderly election but also the interest in a proper ballot; and that the evidence does not support a finding that the public interest in an orderly election was seriously threatened by Galvin's requested injunction.

## A.    Galvin Was Likely To Succeed On The Merits.

I agree with the court's conclusion that Galvin made a strong showing on her statutory claim.[1] The court analyzes the claim thoughtfully and thoroughly but finds it unnecessary to take what appears to be the inevitable last step in its analysis.[2] I would not hesitate to do so; I would conclude that Galvin demonstrated a likelihood of success on the merits. Interpreting the two statutory terms "party affiliation" and "party designation" in a reasonable, practical, and common-sense way, as we are obliged to do,[3] they must mean different things. The court cautiously suggests that "[i]t is unclear why the legislature would use different terms in the same statutory provision to mean the

---

[1]    Opinion at 19.

[2]    Opinion at 24.

[3]    *Attorneys Liab. Prot. Soc'y, Inc. v. Ingaldson Fitzgerald, P.C.*, 370 P.3d 1101, 1105 (Alaska 2016) (quoting *Municipality of Anchorage v. Stenseth*, 361 P.3d 898, 904 (Alaska 2015)).

same thing."[4] Under our usual rules of statutory construction, the legislature would not do so.[5]

The Division itself recognized the distinction between registration and affiliation in its ballot designs for the August 2018 primary election, the November 2018 general election, and the August 2020 primary election, in all of which it listed Galvin's "registration status" ("U" or "N") as well as "the name of the party whose nomination [she] sought" (the Alaska Democratic Party).[6] These separate ballot identifiers were especially significant last year given the high-profile nature of Galvin's campaign as a candidate independent of either major party.

**B.     The Public Interest Includes An Interest In A Proper Ballot.**

I recognize, as the court explains today, that a finding of probable success on the merits — something we can decide as a matter of law — does not eliminate the superior court's discretion to decide whether to grant the extraordinary remedy of injunctive relief.[7] The court concludes that the superior court, in the exercise of its discretion, could have relied on the public interest to deny injunctive relief regardless of how likely it was that Galvin would eventually prevail.[8] In my view, this explanation

---

[4]     Opinion at 20.

[5]     *See id.* note 40 ("Principles of statutory construction mandate that we assume the legislature meant to differentiate between two concepts when it used two different terms." (quoting *Alaska Spine Ctr., LLC v. Mat-Su Valley Med. Ctr., LLC*, 440 P.3d 176, 182 (Alaska 2019))).

[6]     *See* Opinion at 4.

[7]     Opinion at 10-11.

[8]     Opinion at 27.

defines the public interest too narrowly and gives too much credence to the Division's largely conclusory predictions of electoral chaos.

The court somewhat selectively defines the public interest at stake as "the public's interest in an orderly election."[9] An orderly election is of course a laudable goal, but good order is only one of the Division's responsibilities. The governing statute requires the Division to prepare ballots in such a way as "to facilitate fairness, simplicity, and clarity in the voting procedure, to reflect most accurately the intent of the voter, *and* to expedite the administration of elections."[10] And fairness is not just a statutory command, it is a constitutional imperative: "The proposition that our democratic society has a strong public interest in fair elections is tautological."[11]

We very recently elaborated on these concerns in the context of the State-prepared ballot summary of a voter initiative: "Because a ballot is the paper upon which voters give expression to their choices, and exercise their lawmaking right, '[a] biased, misleading, or inaccurate ballot undermines the voting process.' "[12] A proper ballot

---

[9] Opinion at 25.

[10] AS 15.15.030 (emphasis added).

[11] *Alaska Miners Ass'n v. Holman*, 397 P.3d 312, 317 n. 29 (Alaska 2017) (quoting *Municipality of Anchorage v. Citizens for Representative Governance*, 880 P.2d 1058, 1062 (Alaska 1994)) (explaining why groups challenging lieutenant governor's certification of ballot initiative were constitutional litigants for purposes of statute protecting them from adverse attorney's fee award); *see also Sonneman v. State*, 969 P.2d 632, 635 (Alaska 1998) (recognizing that statute allocating candidate positions on ballots "governs the mechanics of the electoral process itself and directly impacts voting rights under the federal and state constitutions").

[12] *State v. Vote Yes for Alaska's Fair Share*, 478 P.3d 679, 687 (Alaska 2021) (alteration in original) (quoting *Faipeas v. Municipality of Anchorage*, 860 P.2d 1214,

(continued...)

should be as much a part of a court's weighing of the public interest as is an orderly process.[13]

## C. The Evidence Did Not Support A Finding That Injunctive Relief Was Likely To Disrupt An Orderly Election.

Recognizing that the public interest factor cuts both ways requires us to look more closely at the allegation that ultimately won this case for the State — that injunctive relief would "throw the Division — and thus the November 2020 general election — into chaos." That an injunction would create hardship is undeniable; the Division had already taken most preparatory steps essential to a smoothly run election, and many of those steps would need to be redone, this time within a compressed time frame. But the evidence supported a finding that the Division could do it; more importantly, the evidence did *not* support a finding that the Division could *not* do it.

The facts underlying the Division's chaos theory are mostly found in the September 17 affidavit of Gail Fenumiai, the Division's well-qualified and highly experienced Director, who explained both what had been done and what remained to be done to ensure an orderly general election. On September 18, 45 days before election day, the Division was required by federal law to send absentee ballots to "uniformed and

---

[12]      (...continued)
1222 (Alaska 1993)).

[13]      *See Indep. Party v. Padilla*, 184 F. Supp. 3d 791, 798 (E.D. Cal. 2016) (denying Independent Party request to be recognized as political party where "independent" was already used as identifier for candidates unaffiliated with any existing party, citing state's "important competing public interest in avoiding voter confusion on the ballots").

overseas voters."[14] That same day, the Division planned "to send ballots to a subset of voters under Alaska law that are known as 'State Advance' voters." These two groups combined required 11,631 early ballots. The next identified deadline was the "[w]eek of September 28," when the Division *began* to send "absentee ballots to voters who ha[d] requested them." At around the same time — still two to three weeks before the start of early voting on October 19 — the Division expected to send "[b]allot materials . . . to many of Alaska's remote polling places."

As the court acknowledges,[15] the September 18 deadline in federal law for sending ballots to uniformed and overseas voters may be waived under certain circumstances, including "a delay in generating ballots due to a legal contest."[16] A delay could mean that absentee ballots would take longer to count; it would not disenfranchise voters.[17] If an exigency overrode that deadline, the next target date — the week of September 28 — was when the Division *began* to send out absentee ballots, still with five weeks remaining before election day. Could the Division meet that deadline? All

---

[14] Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20302(a)(8)(A) (2018). Fenumiai explained that the deadline was actually September 19, but that day was a Saturday, when the Post Office did not offer bulk mail service.

[15] Opinion at 5 note 7.

[16] 52 U.S.C. § 20302(g)(2)(B)(ii). The source of an Alaska "State Advance" voter deadline is not explained in our record.

[17] *See N.J. Democratic Party v. Samson*, 814 A.2d 1028, 1041 (N.J. 2002) (concluding that amending ballots after absentee ballots had been mailed to uniformed and overseas voters would not violate their voting rights, because if it becomes "necessary to extend the time for certifying the election to allow absentee ballots to be tabulated, that remedy is also available" under federal law).

evidence in the record indicates that it could. The challenged ballots — already printed at the time of the hearing — had taken ten days to print: from September 5, when the "[g]eneral election ballot artwork [was] sent to the printer," to September 15, when "800,000 ballots, including 47 different versions, had been printed."[18]

Fenumiai's testimony at the preliminary injunction hearing focused on the paper supply. In her affidavit she had explained that the Division's printer "has approximately 390,000 sheets of the required special ballot paper." The amount was plenty for the uniformed and overseas ballots, which Fenumiai predicted could be reprinted "within a week," meaning that any required extension of that federal deadline could be short. But if the printer had to acquire more paper — which it would have to do to reprint all 800,000 ballots — "it would take one week to get the paper [from the supplier in Seattle] to the printer's location," and for a quick turnaround the printer would have to hire more staff on short notice, which could be problematic. Questioned about these issues at the hearing, Fenumiai testified that the printer had told her it could get the additional ballot paper no earlier than September 29, although the Division had made no efforts to secure paper from a different source. Even assuming that some of the printing had to wait until September 29, the printer had enough paper on hand to cover

---

[18] According to local news reports, on September 24 — six days after this court accepted the Division's representation that it was too late to modify the ballots to address Galvin's concern — the Division responded to an Anchorage house candidate's complaint that his political affiliation had been left off the ballot by reprinting ballots for house districts in Chugiak, Palmer, Anchorage, and southwestern Alaska. *See* James Brooks, *After Libertarian Challenge, Alaska Elections Officials Reprint Ballots for 4 State House Districts*, ANCHORAGE DAILY NEWS (Sept. 28, 2020), https://adn.com/politics/alaska-legislature/2020/09/28/after-libertarian-challenge-alaska-elections-officials-reprint-ballots-for-4-state-house-districts/. The Division redesigned and reprinted 81,500 ballots "for the four impacted district[s]," reportedly within three days of the Director's decision to do so. *Id.*

all the uniformed and overseas voters, the "State Advance" voters, the regular absentee voters, and a good portion of the remainder. And once resupplied with paper, the printer would still have 20 days to finish the job before the start of early voting on October 19.

Fenumiai identified other timing challenges besides the printing itself. She explained that "[v]oting equipment is tested for accuracy for the general election ballot" beginning on "September 10 and continuing through September." But the various steps do not take up that entire time: they include initial testing of scanners at the Director's office (four days), a "second round of testing in the regional offices" (approximately five days), and "reprogram[ming] the ballots that appear on the touch screen units" ("a minimum of eight hours"). Additional time is necessary for logistics such as shipping equipment from one location to another and coordinating with local election boards so that testing can be done with the appropriate oversight; there was no evidence that this added time would be significant. And problems with the scanners do not mean disenfranchising voters, only that ballots would need to be hand-counted. In sum, nothing in the Director's list of tasks suggests that they could not be successfully accomplished by October 19, the start of early voting — which was still over a month away on the day we decided this appeal.

It is understandable that a court will defer to an expert's judgment when faced with a consequential issue in a technically complex area, especially when the court must act on shortened time. But when considering the newly adopted public interest factor, it is imperative that courts critically examine what the State claims to be in the public interest — the State's interest and the public interest will not always align. I assume most would agree that Galvin's probability of success on the merits would entitle her to injunctive relief if, with 45 days remaining before election day, she learned that the Division had left her name off the ballot entirely, or that it had inadvertently switched

the party affiliations of the two major party candidates. This case is perhaps in a different place on the continuum of cases demanding an extraordinary judicial remedy, but the Division would have exactly the same public interest argument in each case: any change now would threaten an orderly election. The evidence that would not carry the day in those cases should not do so here either.

### D. Conclusion

Given the public interest in a proper ballot and the weakness of the Division's evidence that the ballots could not be timely corrected without serious harm to an orderly election, I would hold that it was an abuse of discretion to deny the requested injunction.